UNITED STATES of America ex rel. Anthony SCOLERI, Appellant,

v.

William J. BANMILLER, Warden, Eastern State Penitentiary.

No. 13834.

United States Court of Appeals Third Circuit.

Argued June 5, 1962.

Decided Oct. 10, 1962.

Rehearing Denied Dec. 11, 1962.

Michael von Moschzisker, Philadelphia, Pa., for appellant.

Paul M. Chalfin, First Asst. Dist. Atty., Philadelphia, Pa. (Domenick Vitullo, Asst. Dist. Atty., Arlen Specter, Asst. Dist. Atty., Chief, Appeals Div., James C. Crumlish, Jr., Dist. Atty., Philadelphia, Pa., on the brief), for appellee.

Before BIGGS, Chief Judge, and GOODRICH, McLAUGHLIN, KALODNER, STALEY, HASTIE, GANEY and SMITH, Circuit Judges.

BIGGS, Chief Judge.

In this habeas corpus proceeding, in which the writ was denied,[1] we are concerned with an issue which arises under the Due Process Clause of the Fourteenth Amendment, an issue which is almost the same as that which was before us in United States ex rel. Thompson v. Price, 258 F.2d 918, 3 Cir., certiorari denied 358 U.S. 922, 77 S.Ct. 295, 3 L. Ed.2d 241 (1958), and which we there decided against the relator. The operative facts in the case at bar are somewhat different and we reach a different result.

Anthony Scoleri was indicted, tried, convicted and sentenced to death by the Court of Oyer and Terminer, Philadelphia County, for the felony murder of Max Gordon in Philadelphia on August 28, 1958. The trial took place November 17 through November 26, 1958. A jury was employed. During the prosecution's case-in-chief Richard Febo testified that he had known the relator for about eighteen years and at one time had been sentenced to prison with him. Scoleri's counsel moved for the withdrawal of a juror. This motion was denied but the court informed the jury that it would be charged later "with re-

spect to that kind of testimony". There followed a conference at side-bar as to the method of charging the jury but it is unnecessary to detail that conference here. At a later point in the trial, when Lieutenant William Del Torre of the Philadelphia Police Force, the expert in charge of its ballistics laboratory, was testifying, the issue with which we are concerned came squarely before the trial court. The Assistant District Attorney stated: "I offer to prove for the purpose of penalty the prior record of convictions for armed robbery and burglaries of the defendant through the original bills of indictment * * * and through identification witnesses." Scoleri's counsel objected to any proof of his client's criminal record, specifically relying on the Due Process Clause. The objection was overruled and Scoleri's criminal record was put before the jury, with an instruction, however, that the record was to be considered by the jury solely in connection with fixing the penalty. The court admonished the members of the jury that "you are not to consider this record in any manner whatsoever in your consideration of the facts." This admonition was repeated later in the court's charge to the jury.[2]

1. See 198 F.Supp. 872 (D.C.E.D.Pa.1961). Scoleri has exhausted his state remedies. See id. p. 873, citing Commonwealth v. Scoleri, 399 Pa. 110, 160 A.2d 215, certiorari denied, 364 U.S. 849, 81 S.Ct. 93, 5 L.Ed.2d 72 (1960). Cf. Ex parte Abernathy, 320 U.S. 219, 64 S.Ct. 13, 88 L.Ed. 3 (1943); Darr v. Burford, 339 U.S. 200, 70 S.Ct. 587, 94 L.Ed. 761 (1950); United States ex rel. Ackerman v. Johnston, 235 F.2d 958 (3 Cir. 1956), certiorari denied, 352 U.S. 942, 77 S.Ct. 264, 1 L.Ed.2d 238 (1956). See Section 2254, Title 28 U.S.C.

2. The court stated: "If you decide in this case, after examining it very carefully, that it is murder in the first degree, then you must consider the penalty. This is your penalty which you indicate, but not impose, and I notice that you have been asked in thundering tones, Are you going to send him to the electric chair on the testimony of David Tupper? Are you going to send this man to the electric chair on the testimony of Dr. Kushner,

the optometrist? Are you going to send this man to the electric chair, was thundered at you, on the testimony of Haitz? Certainly, you are not. It would be terrible if you did that. You are not being asked to send this man to the electric chair on the testimony of any single witness. It might well have been said to you that on the combined testimony of all these people what is your determination? Are you going to find him guilty of murder in the first degree? That was not even discussed with you, but I tell you members of the jury, that you have those other decisions that you can properly make under the testimony in this case, and I bid you recall the evidence as you heard it, and I bid you, if you find a verdict of murder in the first degree in this case, that then, and then only, you consider this man's record and what he is. What is he? What is the enormity of this crime? The Commonwealth seeks no vengeance against him. The Commonwealth in the main seeks deterrence of other people who do this kind

It was thus brought to the attention of the jury that Scoleri had been convicted of or had pleaded guilty to twenty-five different charges of armed robbery. The jury found Scoleri guilty of first degree murder and returned "Death" as the penalty. That sentence was imposed by the court. A motion for a new trial based on the introduction of Scoleri's criminal record was overruled. The Supreme Court of Pennsylvania affirmed the judgment, three Justices dissenting. The Supreme Court of the United States denied certiorari. See note 1, supra. Habeas corpus was denied by the court below. The appeal at bar followed.

On August 28, 1958, the day of Gordon's murder and thereafter until its amendment by the "Split-Verdict Act" of December 1, 1959, P.L. 1621, Section 1, 18 P.S. § 4701 (Supp.),[3] Section 701 of the Pennsylvania Criminal Code of 1939 applied in cases of first degree murder. The second paragraph of Section 701 provided in pertinent part: "Whoever is convicted of the crime of murder of the first degree is guilty of a felony and shall be sentenced to suffer death in the manner provided by law, or to undergo imprisonment for life, at the discretion of the jury trying the case, which shall fix the penalty by its verdict. The court shall impose the sentence so fixed, as in other cases. * * *"

Under that portion of the second paragraph of Section 701 of the Criminal Code of 1939 quoted, the jury had the duty of determining the penalty when, as in Scoleri's case, they convicted a defendant of first degree murder. The precursor of the statute referred to was the Act of May 14, 1925, P.L. 759. The earlier Act need not be quoted here for, insofar as the essential elements of the instant case are concerned, its substance was the same. In respect to its effect, Judge Maris of this court, in United States ex rel. Thompson v. Price, 258 F. 2d at p. 921, correctly and succinctly stated: "The Act of 1925 was interpreted by the Supreme Court of Pennsylvania to permit the admission of evidence of prior [unrelated] convictions solely for the purpose of enabling the jury, after it has found the accused guilty of first degree murder, to know what manner of man he is and whether he is entitled to mercy when they under-

---

of thing, but I don't know that he has done it. That is for you to decide, and when you were sworn you said you would."

3. The "Split-Verdict Act" of December 1, 1959, provides in pertinent part that: "Whoever is convicted of the crime of murder of the first degree is guilty of a felony and shall be sentenced to suffer death in the manner provided by law, or to undergo imprisonment for life, at the discretion of the jury trying the case, which shall, in the manner hereinafter provided, fix the penalty. In the trial of an indictment for murder, the court shall inform the jury that if they find the defendant guilty of murder in the first degree, it will be their further duty to fix the penalty therefor, after hearing such additional evidence as may be submitted upon that question. Whenever the jury shall agree upon a verdict of murder of the first degree, they shall immediately return and render the same, which shall be recorded, and shall not thereafter be subject to reconsideration by the jury, or any member thereof. After such verdict is recorded and before the jury is per-

mitted to separate, the court shall proceed to receive such additional evidence not previously received in the trial as may be relevant and admissible upon the question of the penalty to be imposed upon the defendant, and shall permit such argument by counsel, and deliver such charge thereon as may be just and proper in the circumstances. The jury shall then retire and consider the penalty to be imposed and render such verdict respecting it as they shall agree upon. A failure of the jury to agree upon the penalty to be imposed, shall not be held to impeach or in any way affect the validity of the verdict already recorded, and whenever the court shall be of opinion that further deliberation by the jury will not result in an agreement upon the penalty to be imposed, it may, in its discretion, discharge the jury from further consideration thereof, in which event if no retrial of the indictment is directed, the court shall sentence the defendant to life imprisonment upon the verdict theretofore rendered by the jury, and recorded as aforesaid. The court shall impose the sentence so fixed as in other cases. * * *"

take their task of deciding what penalty should be imposed upon him." See Commonwealth v. Parker, 294 Pa. 144, 151–155, 143 A. 904, 906–907 (1928), in which Chief Justice von Moschzisker considered the effect upon the admissibility of evidence of prior convictions under the Act of the rule of evidence that, in the trial of a defendant for a crime, evidence of other independent, unconnected offenses committed by him is not admissible to establish his guilt of the crime for which he is on trial. As Judge Maris stated, id. supra, 258 F.2d at p. 921, "The Chief Justice stated that since the statute required the jurors to assess the punishment and permitted them to extend mercy in a proper case by reducing the penalty to life imprisonment, the jury should be permitted to have the same sort of information that a judge considers when he decides as to the punishment for crime. But since in Pennsylvania the jurors may not render piecemeal verdicts there is no provision for separate inquiry. Hence, concluded the Chief Justice, their single verdict must include both their finding as to the defendant's guilt and their determination as to the penalty to be imposed upon him." Chief Justice von Moschzisker concluded that the prescribed statutory practice was a permissible and proper one.

This ruling was followed by the Supreme Court in later cases[4] and, until the amending statute was passed, was the law of Pennsylvania.[5] It was, as we have stated, followed at Scoleri's trial, despite objections, and was approved by the Supreme Court of Pennsylvania on appeal by a vote of four Justices to three. See Commonwealth v. Scoleri, 399 Pa. 110, 160 A.2d 215 (1960). We reiterate that, in United States ex rel. Thompson v. Price, supra, this court, with two

judges dissenting on petition for rehearing, held the practice not to be a violation of the standards of fundamental fairness required by the Fourteenth Amendment. In the case last cited, Judge Hastie, in a concurring opinion, made it clear that he would have dissented if the record of Thompson's conviction by a court martial had not been admitted into evidence not only without objection but with the consent of defense counsel. In the instant case there is no dispute that the record of Scoleri's twenty-five prior unrelated convictions of, or pleas of guilty to, charges of robbery with violence was objected to on the grounds of violation of the guarantee of due process; it is also plain that these objections were adhered to throughout the trial, were asserted in the Supreme Court of Pennsylvania, in the Supreme Court of the United States and in the court below.

■■ The appellee asserts that Scoleri himself opened the door to the admission in evidence of his criminal record, and thereby, in effect, waived his rights under the Fourteenth Amendment. The appellee relies on five incidents which occurred at the trial. First, the appellee points to Scoleri's testimony on direct examination concerning his desire to take Ricky Woods, one of the robbers who had been shot in the holdup, to the hospital. At this point, he testified, Dante Scoleri, his brother, told him: "Tony, with your record they will never believe you weren't there". Second, Scoleri also testified on direct examination that when he was asked for help by one of the men who had engaged in the hold-up, he said: " * * * I told him I had my back time, 30 years—30 years parole hanging over my head, and there wasn't much I could do without becoming involved." Third, when

4. See Commonwealth v. Thompson, 389 Pa. 382, 399–400, 133 A.2d 207, 216 (1957), certiorari denied 355 U.S. 849, 78 S.Ct. 77, 2 L.Ed.2d 59 (1957), and the decisions cited in the text. The practice was known as the "Parker Rule".

5. We deem it unnecessary to discuss in this opinion the Act of March 15, 1911, P.L. 20, 19 P.S. § 711, or the Act of July 3, 1947, P.L. 1239, held unconstitutional in Commonwealth v. De Pofi, 362 Pa. 229, 66 A.2d 649 (1949), certiorari denied, 338 U.S. 852, 70 S.Ct. 82, 94 L.Ed. 522 (1949).

Scoleri was asked by his counsel who Richard Febo was, he replied: "Richard Febo was my accomplice when we were arrested in 1948 for a series of armed robberies." Four, the appellee asserts that Doctor Anthony F. Vasquez, pastor of St. John the Baptist Church, in Philadelphia, testifying on Scoleri's behalf made reference to Scoleri's criminal record, to his imprisonment and to his being on parole. Five, that Ida Iocco, a witness called on behalf of the State, testified on cross-examination in reply to the question who is Febo, "He is a friend of Tony's [Scoleri's]. He was in prison with Tony, I understand, I was told." The appellee points out that Scoleri's counsel made no objection to this statement by Iocco.

But the first attempt at introduction of evidence relating to Scoleri's criminal record was at p. 489 of the transcript of his trial and its first admission was at p. 490 over Scoleri's counsel's objection. A defense motion to withdraw a juror was then denied. The formal introduction of Scoleri's record of twenty-five convictions of or pleas of guilty to armed robbery was at pp. 626–633 of the transcript. At this point the fat had already been put in the fire and the only statement respecting imprisonment or crimes of Scoleri preceding pp. 626–633 and 489–490 was that of Iocco who said at p. 470 that she had been told that Febo and Scoleri had been in prison together. True, Scoleri's counsel or the prosecuting attorney should have moved that this hearsay statement be stricken from the record or the alert trial judge should have done so *sua sponte*. We cannot treat this hearsay evidence as a waiver of constitutional rights by Scoleri or construe it as an escalator to precipitate twenty-five convictions of or pleas of guilty to charges of armed robbery into the record. Putting the matter bluntly the appellee's argument seems to have been advanced as an afterthought. It is totally lacking in validity. We cannot deem a right inhering in a defendant by virtue of the Due Process Clause of the Fourteenth Amendment to be so easily waived. Glasser v. United States, 315 U.S. 60, 70, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

In respect to the habitual criminal statutes and their applicability, we point out that we are dealing here with a death sentence. The danger resulting from prejudice is always enhanced in a capital case: passions run high, and the penalty is irreversible. Under the habitual criminal statutes the Supreme Court of the United States has permitted evidence of prior unrelated crimes to come before a jury. But the admission into evidence of these prior convictions could, at most, subject the defendant to an additional prison term as a recidivist. The case now before us involved a trial for a capital crime, a crime punishable by death. To say that such evidence is permissible in the former situation and therefore *a fortiori* in the latter, is to ignore the crucial distinction between a trial which could result only in a prison sentence and one which could and in this case did lead to the imposition of the death penalty. The Supreme Court has recognized clearly the validity of this kind of distinction in Betts v. Brady, 316 U.S. 455, 462, 62 S. Ct. 1252, 86 L.Ed. 1595 (1942). It was there held that although due process does not require that an indigent defendant be furnished counsel in a non-capital case, where the crime is one punishable by death counsel must be provided. The Court stated: "That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial. In the application of such a concept, there is always the danger of falling into the habit of formulating the guarantee into a set of hard and fast rules, the application of which in a given case may be to ignore the qualifying factors therein disclosed." We think that the principle so well illustrated by the decision in Betts v. Brady, supra, is applicable at bar.

This court, as presently constituted, limits the position that it took in United States ex rel. Thompson v. Price to cases in which the defendant did not object to the admission into evidence of his prior record of unrelated criminal convictions. The issue before us was well put by the Supreme Court in Michelson v. United States, 335 U.S. 469, 475–476, 69 S.Ct. 213, 93 L.Ed. 168 (1948), where it was stated: "The state may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice.", citing 1 Wigmore, Evidence (3rd ed., 1940) Section 57.

Despite the careful charge of the experienced judge presiding at Scoleri's trial, in which he explained to the members of the jury their function of finding the defendant guilty or not guilty of murder and their separate function of fixing the penalty of death or life imprisonment, we cannot believe that the procedural scheme imposed by Section 701 of the Criminal Code of 1939 and the "Parker Rule" would permit the jurors to put the knowledge of Scoleri's twenty-five convictions or pleas of guilty out of their minds while considering his guilt or innocence. Certainly such a feat of psychological wizardry verges on the impossible even for berobed judges. It is not reasonable to suppose that it could have been accomplished by twelve laymen brought together as a jury. The admission of such evidence in Scoleri's trial must therefore be deemed to have been gravely prejudicial. We conclude that Scoleri's trial in this respect was so fundamentally unjust as to cause the trial court to lose jurisdiction. Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). The conclusion that Scoleri was overreached by the procedure followed at his trial is irresistible. Cf. United States ex rel. Almeida v. Baldi, 195 F.2d 815, 33 A.L.R. 2d 1407 (3 Cir.1951), certiorari denied, 345 U.S. 904, 73 S.Ct. 639, 97 L.Ed. 1341 (1953). Mr. Justice Burton put the answer to our present inquiry succinctly when he stated in Bute v. Illinois, 333 U.S. 640, 649, 68 S.Ct. 763, 92 L.Ed. 986 (1948), that due process under the Fourteenth Amendment " * * * has reference * * * to a standard of process that may cover many varieties of processes that are expressive of differing combinations of historical or modern, local or other juridical standards, provided they do not conflict with the 'fundamental principles of liberty and justice which lie at the base of all our civil and political institutions * * *.' " Here the conflict is obvious and glaring.

The judgment of the court below will be reversed with the direction to grant the writ of habeas corpus. The Superior Court of Pennsylvania has held that no issue of double jeopardy can be raised under the circumstances. Commonwealth v. Townsend, 167 Pa.Super. 71, 76–77, 74 A.2d 746, 749 (1950), certiorari denied, Townsend v. Burke, 340 U.S. 915, 71 S.Ct. 286, 95 L.Ed. 661 (1951).[6] Scoleri may therefore be promptly retried by the Commonwealth. The "Split-Verdict Act" of December 1,

---

6. See also Commonwealth ex rel. Farrow v. Martin, 387 Pa. 449, 127 A.2d 660 (1956), certiorari denied Farrow v. Pennsylvania, 353 U.S. 986, 77 S.Ct. 1288, 1 L. Ed.2d 1144 (1957); Commonwealth ex rel. Townsend v. Burke, 361 Pa. 35, 41,

63 A.2d 77, 79–80 (1949); Commonwealth ex rel. Wallace v. Burke, 169 Pa. Super. 633, 636, 84 A.2d 254, 255 (1951); Commonwealth v. Gibbs, 167 Pa.Super. 79, 83–84, 74 A.2d 750, 753–754 (1950).

1959, 18 P.S. § 4701 (Supp.), will, of course, be applicable.

GOODRICH, Circuit Judge participated in the consideration of this case but died prior to the filing of this opinion.

KALODNER, Circuit Judge (dissenting).

I dissent from the majority's disposition for two reasons:

"(1) I disagree with its holding that the Pennsylvania procedure under which Scoleri was tried transgressed the bounds laid down for state procedure by the due process clause of the Fourteenth Amendment, and

"(2) I disagree with its holding that Scoleri did not waive the protection which the majority says was accorded him by the federal due process clause."

It must immediately be noted that in condemning as an abuse of federal process the Pennsylvania procedure pursued in the Scoleri trial the majority is overruling—and not merely limiting, as it asserts—our express ruling to the contrary just four years ago in United States ex rel. Thompson v. Price, 258 F. 2d 918, 922, 3 Cir., cert. den. 358 U.S. 922, 77 S.Ct. 295, 3 L.Ed.2d 241 (1958). In Price, "We conclude[d] that the Pennsylvania procedure here under attack does not pass the bounds laid down for state procedure by the due process clause." We prefaced that holding with the statement that "It is well settled that no particular form of procedure in state criminal trials is guaranteed by the due process clause of the Fourteenth Amendment", and cited in support the teaching of the Supreme Court of the United States that "it has long been recognized as the very essence of our federalism that the States should have the widest latitude in the administration of their own systems of criminal justice." [1]

THE DUE PROCESS ISSUE:

While this Court can overrule its prior holding in Price, it can not overrule, nor can it reject, the teaching of the Supreme Court to which we gave effect four years ago in that case.

The case books abound with instances in which the Supreme Court has applied the principles stated in Price. A year ago, in Cohen v. Hurley, 366 U.S. 117, 81 S.Ct. 954, 6 L.Ed. 156 (1961) it was held, for example, that exemption from compulsory self-incrimination is not safeguarded as against state action by the Fourteenth Amendment. In Cicenia v. La Gay, 357 U.S. 504, 78 S.Ct. 1297, 2 L.Ed.2d 1523 (1958) it was held that the refusal to permit one accused of murder the privilege of consulting his counsel while being questioned by State Police between arrest and arraignment did not of itself violate federal due process. It is interesting to note that in the case just cited this Court's ruling to the same effect was affirmed.[2]

In Twining v. New Jersey, 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97 (1908) it was held that putting the accused on the stand as a witness for the State did not violate federal due process; in Maxwell v. Dow, 176 U.S. 581, 20 S.Ct. 448, 44 L. Ed. 597 (1900) a provision in the Utah Constitution for a jury of eight jurors in all state criminal prosecutions, for other than capital offenses, was held beyond the reach of federal due process; in Hurtado v. People of California, 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232 (1884) it was held that federal due process does not require an indictment by a Grand Jury in a prosecution by a State for murder.

Well over half a century ago, the Supreme Court, in Rogers v. Peck, 199 U. S. 425, pp. 433–434, 26 S.Ct. 87, p. 89, 50 L.Ed. 256 (1905) in discussing the sweep of the federal writ of habeas corpus said:

"The extent of the right of the Federal courts to interfere by the

---

1. Hoag v. New Jersey, 356 U.S. 464, 468, 78 S.Ct. 829, 2 L.Ed.2d 913 (1958).

2. In the Matter of the Application of Cicenia for a Writ of Habeas Corpus, 240 F.2d 844 (3 Cir. 1957).

writ of habeas corpus with the proceedings of courts and other authorities of a State is carefully defined by statute. When a prisoner is in jail he may be released upon habeas corpus when held in violation of his constitutional rights. * * *

"The reluctance with which this court will sanction Federal interference with a State in the administration of its domestic law for the prosecution of crime has been frequently stated in the deliverances of the court upon the subject. *It is only where fundamental rights, specially secured by the Federal Constitution, are invaded, that such interference is warranted.*" (emphasis supplied)

In Snyder v. Mass., 291 U.S. 97, p. 105, 54 S.Ct. 330, p. 332, 78 L.Ed. 674 (1934) Mr. Justice Cardozo, speaking for the Supreme Court, spelled out the doctrine under review as follows:

"The Commonwealth of Massachusetts is free to regulate the procedure of its courts in accordance with its own conception of policy and fairness unless in so doing it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. * * * *Its procedure does not run foul of the Fourteenth Amendment because another method may seem to our thinking. to be fairer or wiser or to give a surer promise of protection to the prisoner at the bar.*" (emphasis supplied)

The latter statement is particularly pertinent here in view of the fact that the majority opinion makes it clear that its condemnation of the Pennsylvania trial procedure which permitted introduction of Scoleri's prior criminal record for the avowed purpose of guiding the jury in the fixing of sentence in the event of a guilty verdict is premised on its conclusion that the practice was "gravely prejudicial" to the extent that it was "fundamentally unjust" and resulted in Scoleri being "overreached".

The majority has disregarded the repeated admonitions of the Supreme Court that individual judicial notions and concepts of "unfairness" and "prejudice" and "fundamental injustice" with respect to State criminal procedures, no matter how appealing to the American sense of fair-play, is not the critical test to be applied in the application of the federal due process clause.

In Bute v. Illinois, 333 U.S. 640, 68 S.Ct. 763, 92 L.Ed. 986 (1948) which the majority has cited in support of its disposition, the Supreme Court recognized and applied the long-established doctrine that States "should have the widest latitude in the administration of their own systems of criminal justice" and held that the reach of federal due process did not extend to the failure in a non-capital case of a State court "to inquire as to [the petitioner's accused's] desire to be represented by counsel, or his ability to procure counsel, or his desire to have counsel assigned to him * * * in his defense", or to offer or assign counsel to the accused.

In so holding the Court said (pp. 649, 650–651–652, 68 S.Ct. pp. 768–769):

"The Fourteenth Amendment, however, does not say that no state shall deprive any person of liberty without following the *federal* process of law as prescribed for the federal courts in comparable federal cases. It says merely 'nor shall any State deprive any person of life, liberty, or property, without due process of law; * * *.' This *due* process is not an equivalent for the process of the federal courts or for the process of any particular state. It has reference rather to a standard of process that may cover many varieties of processes that are expressive of differing combinations of historical or modern, local or other judicial standards, provided they do not conflict with the 'fundamental principles of liberty and justice . which lie at the base of all

our civil and political institutions * * *.' This clause in the Fourteenth Amendment leaves room for much of the freedom which, under the Constitution of the United States and in accordance with its purposes, was originally reserved to the states for their exercise of their own police powers and for their control over the procedure to be followed in criminal trials in their respective courts. It recognizes that differences arise naturally between the procedures in the state courts and those in the federal courts.

"One of the major contributions to the science of government that was made by the Constitution of the United States was its division of powers between the states and the Federal Government. * * * While there have been modifications made by the states, the Congress and the courts in some of the relations between the Federal Government and the people, there has been no change that has taken from the states their underlying control over their local police powers and state court procedures."

This Court, in United States ex rel. Darcy v. Handy, 224 F.2d 504 (3 Cir. 1955), aff'd 351 U.S. 454, 76 S.Ct. 965, 100 L.Ed. 1331 (1956) gave cognizance to the "established constitutional doctrine" of "our limited function in correcting *fundamental* impropriety in state trials challenged under the due process clause" and said that it "makes it necessary that we leave alone many dubious occurrences in state procedure which we would proscribe if they should happen in a federal court." (emphasis supplied)

The majority has prefaced its holding that the introduction into evidence of Scoleri's prior criminal record was "gravely prejudicial" and "so fundamentally unjust" as to constitute violation of federal due process with citation of Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948) and quotation of a statement therein that

"The state may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by *propensity* a probable perpetrator of the crime." (emphasis supplied)

It must immediately be stated that in Michelson the issue of violation of federal due process in a state criminal trial was not involved. In that case the defendant had been tried in a *federal court* for the bribery of a federal officer and since he had admitted the payment but claimed it was induced by the officer the case hinged on whether the jury believed the defendant or the officer. The federal prosecutor in cross-examination of defendant's character witnesses asked them if they had heard that defendant had been arrested 27 years previously for receiving stolen goods and the issue presented to the Supreme Court was whether the questioning with respect to the arrest constituted reversible error.

The statement in Michelson that evidence of an accused's "prior trouble with the law" or "specific criminal acts" was inadmissible to establish "propensity" to criminal conduct was made in the course of a general discussion of rules of evidence relating to such testimony.

Michelson is completely inapposite to the situation here. In the instant case the Pennsylvania procedure under which Scoleri was tried permitted the introduction of evidence of his prior criminal record not to establish "propensity" but for the single purpose of aiding the jury in its function, under Pennsylvania statute, of fixing the penalty, viz., life imprisonment or death, in the event that it found him guilty of murder in the first degree. As the majority has noted "the experienced judge presiding at Scoleri's trial" gave the jury a "careful charge" in which he, as required by the Pennsylvania decisions, properly cautioned it with respect to the limited use of the criminal record testimony.

The majority has decided, nevertheless, that it would be a "feat of psychological wizardry * * * impossible

even for berobed judges" for jurors "to put the knowledge of Scoleri's twenty-five convictions or pleas of guilty out of their minds while considering his guilt or innocence" and therefore holds the Pennsylvania procedure a violation of federal due process.

In doing so it has completely overlooked the fact that the Supreme Court of the United States has time and again sanctioned the admission of prior criminal records for the purpose of fixing the more severe punishment provided under multiple offender and habitual criminal statutes.

It has also overlooked the fact that under the National Prohibition Act, 27 U.S.C.A. § 46, which fixed heavier sentences for second violations and provided that a prior conviction should be pleaded in the "affidavit, information, or indictment" charging the second offense, this Court held that introduction of evidence of the prior conviction at the trial for the second offense was not only permissible but required. Hefferman v. United States, 50 F.2d 554 (3 Cir.1931).[3]

Habitual criminal statutes providing for greater punishment of second or subsequent offenses by the same person have long been in force in this country[4] and in England. It is the established rule, under such statutes, unless the statute designates a different mode of procedure, that, if the prosecutor desires to invoke the more severe punishment provided as to second or subsequent offenders, the indictment or information must allege the fact of the prior conviction, and the allegation of such conviction must be proved in the trial to the jury.

The Supreme Court, as long ago as 1895, held in Moore v. Missouri, 159 U.S. 673, 16 S.Ct. 179, 40 L.Ed. 301 that a Missouri habitual criminal statute was not in violation of the Fourteenth Amendment or any other provision of the Federal Constitution. In doing so it stated (p. 677, 16 S.Ct. p. 181):

"The fact that the indictment charged a former conviction of another and entirely different offense, is not in fact charging him with an offense with respect of the former offense in the case in hand. *The averments as to the former offense go as to the punishment only.*" (emphasis supplied)

Six years later, in 1901, the Supreme Court in McDonald v. Massachusetts, 180 U.S. 311, 21 S.Ct. 389, 45 L.Ed. 542 in holding that the Massachusetts habitual criminal statute, which provided for charging a former conviction in the indictment, did not violate any of the provisions of the Fourteenth Amendment, rejected the appellant's express contention that "Any statute allowing the government to make bad character a part of its original case is unconstitutional." In doing so the Supreme Court said (p. 313, 21 S.Ct. p. 390):

"The allegation of previous convictions is not a distinct charge of crimes, but is necessary to bring the case within the statute, *and goes to the punishment only.*" (emphasis supplied)

In Graham v. West Virginia, 224 U.S. 616, pp. 629–630, 32 S.Ct. 583, p. 588, 56 L.Ed. 917 (1912) it was held:

"Although the State may properly provide for the allegation of the former conviction in the indictment, for a finding by the jury on this point in connection with its verdict as to guilt and thereupon for the imposition of the full sentence prescribed, there is no constitutional mandate which requires the State to adopt this course even where the former conviction is known. It may be convenient practice, but it is not obligatory. This conclusion neces-

---

3. To the same effect, Massey v. United States, 281 F. 293, 296–298 (8 Cir. 1922); Smith v. United States, 41 F.2d 215, 217 (9 Cir. 1930), cert. den. 282 U.S. 876, 51 S.Ct. 80, 75 L.Ed. 773.

4. In Virginia and New York as early as 1796 and in Massachusetts since 1804.

sarily follows from the distinct nature of the issue and from the fact, so frequently stated, that it does not relate to the commission of the offense, but goes to the punishment only, and therefore it may be subsequently decided. * * *

"A State may make different arrangements for trials under different circumstances of even the same class of offenses."

The foregoing illustrates the teaching of the Supreme Court that the choice of methods for the conduct of criminal trial procedures insofar as they may relate to the order of the introduction of evidence having impact on the critical issue of sentence is reserved to the separate states, and that the freedom of such choice is not proscribed under the Fourteenth Amendment.[5]

Finally, on the score of what has been said it must be noted that this Court in United States ex rel. Collins v. Claudy, 204 F.2d 624 (3 Cir.1953) gave effect to the holding in Pennsylvania ex rel. Sullivan v. Ashe, 302 U.S. 51, 55, 58 S. Ct. 59, 82 L.Ed. 43 (1937) that

*"For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender. His past may be taken to indicate his present purposes and tendencies and significantly to suggest the period of restraint and the kind of discipline that ought to be imposed upon him."* (emphasis supplied)

In Claudy we in fact held that "fundamental fairness in judicial procedure required that the court impose an enhanced penalty only upon the basis of a supporting judicial determination of the essential facts made after the defendant had been informed of and heard upon the issue of recidivism" and that "The omission of such procedure was a denial of due process of law * * *." 204 F.2d 629.

An analysis of judicial decisions discloses that the courts have also permitted wide latitude in the admission of evidence relating to criminal conduct of an accused, independent of the crime charged in the indictment, when evidence of such conduct was introduced to establish "intent" or "design" or "capacity" or "identity" of the actor.[6]

Thus, in United States v. Laurelli, 293 F.2d 830, 3 Cir., cert. den. 368 U.S. 961, 82 S.Ct. 406, 7 L.Ed.2d 392, this Court just a year ago, in a trial charging bribery attempt, sanctioned introduction of testimony of unrelated bribery attempts by the same defendant, one, eleven months, and the other, fourteen or fifteen months, after the bribery attempt charged in the indictment, on the ground that the subsequent conduct was admissible "to show defendant's intent" and "a pattern". 293 F.2d 832.

Evidence of other similar offenses has time and again been held to be admissible for the purpose of establishing *intent* in cases of assault with intent to rape and in prosecutions for crimes involving a depraved sexual instinct. In prosecutions for adultery evidence of prior adulterous conduct has also been held admissible.[7]

5. A long line of cases in the State courts involving state multiple and habitual offender laws have approved the admissibility of evidence of prior convictions before the defendant's guilt or innocence of the subsequent offense has been determined by the jury. See, e. g., State v. Meyer, 258 Wis. 326, 46 N.W.2d 341 (1951); Atha v. State, 217 Ark. 599, 232 S.W.2d 452 (1950); People v. Lawrence, 390 Ill. 499, 61 N.E.2d 361

(1945), cert. den. 326 U.S. 731, 66 S.Ct. 38, 90 L.Ed. 435; Etherton v. Jones, 350 S.W.2d 151 (Ky.1961), cert. den. 369 U.S. 845, 82 S.Ct. 876, 7 L.Ed.2d 848.

6. United States v. Stirone, 262 F.2d 571, 576 (3 Cir. 1959), rev'd on other grounds, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960).

7. 2 Wigmore, Evidence (3rd ed. 1940) §§ 300–373.

Again, defendants in criminal cases who offer good character testimony open the door to the introduction of prior criminal records.

What has been said on the score of the exceptions to the general rule which excludes evidence of other crimes designed to show *propensity* makes it clear that the exceptions are almost as general as the rule itself.

At any rate, as it was said in Baltimore Radio Show v. State, 193 Md. 300, 67 A.2d 497, 510 (1949), cert. den. 338 U.S. 912, 70 S.Ct. 252, 94 L.Ed. 562 (1950):

> "Without questioning the soundness of the rule of exclusion prior to verdict, it remains a rule of evidence, not a constitutional right."

Here the majority has exalted a simple evidentiary rule to the hallowed status of a constitutional guarantee, and its action in doing so is without precedent.

In conclusion, this too must be said on the score of the majority's holding that the Pennsylvania procedure pursued in the Scoleri trial violated federal due process:

While it is true that the denial of an application for certiorari by the Supreme Court of the United States is not to be construed as approved of the decision sought to be reviewed, it at least merits observation that the Court has in recent years denied applications for certiorari in ten cases [8] including that of Scoleri, where the Pennsylvania Supreme Court had sustained convictions in cases tried pursuant to the procedure now condemned by the majority as in violation of federal due process, and in United States ex rel. Thompson v. Price, supra, where we specifically held that the procedure involved was not in violation of federal due process. On this score it certainly cannot be said that the United States Supreme Court has in recent years failed to evidence adequate appreciation of the vitality and sweep of the federal due process clause. It merits notation that in only one of the cases in which certiorari was denied, Commonwealth v. Rucker, sub. nom. Rucker v. Pennsylvania, 368 U.S. 868, 82 S.Ct. 91, 7 L.Ed.2d 65 (1961),[9] one justice ex-

---

8. The ten applications denied, including that of Scoleri, are as follows:

Commonwealth v. Simmons, 361 Pa. 391, 65 A.2d 353 (1949), cert. den. 338 U.S. 862, 70 S.Ct. 96, 94 L.Ed. 528 (death sentence imposed)

Commonwealth v. De Pofi, 362 Pa. 229, 66 A.2d 649 (1949), cert. den. 338 U.S. 852, 70 S.Ct. 82, 94 L.Ed. 522 (death sentence imposed)

Commonwealth v. Johnson, 372 Pa. 266, 276–277, 93 A.2d 691 (1953), cert. den. 345 U.S. 959, 73 S.Ct. 944, 97 L.Ed. 1379 (life imprisonment imposed)

Commonwealth v. Lowry, 374 Pa. 594, 603, 98 A.2d 733 (1953), cert. den. 347 U.S. 914, 74 S.Ct. 479, 98 L.Ed. 1070 (life imprisonment imposed)

Commonwealth v. Cannon, 386 Pa. 62, 64–65, 123 A.2d 675 (1956), cert. den. 352 U.S. 898, 77 S.Ct. 139, 1 L.Ed.2d 90 (life imprisonment imposed)

Commonwealth v. Thompson, 389 Pa. 382, 133 A.2d 207 (1957), cert. den. 355 U.S. 849, 78 S.Ct. 77, 2 L.Ed.2d 59 (death sentence imposed)

Commonwealth ex rel. McNeair v. Banmiller, 391 Pa. 119, 137 A.2d 454 (1958), cert. den. 356 U.S. 946, 78 S.Ct. 793, 2 L.Ed.2d 821 (life imprisonment imposed)

Commonwealth v. Wilson, 394 Pa. 588, 608, 148 A.2d 234 (1959), cert. den. 361 U.S. 844, 80 S.Ct. 97, 4 L.Ed.2d 82 (life imprisonment imposed)

Commonwealth v. Scoleri, 399 Pa. 110, 160 A.2d 215 (1960), cert. den. 364 U.S. 849, 81 S.Ct. 93, 5 L.Ed.2d 72 (death sentence imposed)

Commonwealth v. Rucker, 403 Pa. 262, 168 A.2d 732 (1961), cert. den. 368 U.S. 868, 82 S.Ct. 91, 7 L.Ed.2d 65 (death sentence imposed)

In addition the Supreme Court denied the application for certiorari, 358 U.S. 922, 77 S.Ct. 295, 3 L.Ed.2d 241, from our decision in United States ex rel. Thompson v. Price, 258 F.2d 918 (3 Cir. 1958) holding that the Pennsylvania procedure here involved was not an abuse of federal due process.

9. Appeal is now pending in this Court from the denial of a writ of habeas corpus by the United States District Court for the Eastern District of Pennsylvania in United States ex rel. Rucker v. Myers,

pressed an opinion that it should have been granted.

### THE WAIVER ISSUE:

The majority holds that Scoleri did not, at his trial, waive the protection which it says was accorded him by the federal due process clause. It dismisses as "totally lacking in validity" the contention of the Commonwealth of Pennsylvania, via the appellee, to the contrary.

I disagree.

Assuming, arguendo, that the majority has correctly held that the admission into evidence of Scoleri's criminal record, over his objection, in the course of the prosecution's case, was fundamental error violative of federal due process, the trial record establishes that Scoleri waived or cured that error when he invoked his criminal past in the presentation of his defense, as subsequently detailed.

On that score, it is settled law that federal due process rights may be waived "intelligently and understandingly", Carnley v. Cochran, 369 U.S. 506, 513, 82 S.Ct. 884, 8 L.Ed.2d 70 (1962), and whether such a waiver has occurred "must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused", Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); further, an error in the admission of testimony, over objection, is *cured* when the party injured thereby subsequently offers similar testimony in his own defense, 1 Wigmore, Evidence, § 18(D) (3 ed. 1940): otherwise stated, "If it happens that a party who has objected to evidence of a certain fact himself produces evidence from his own witness of the same fact, of course, he has *waived* his objection", McCormick, Evidence, § 55, at 129 (1954).

First, as to the "background" and "experience" of Scoleri:

The record discloses that he was almost 30 years old at the time of his trial; he had earlier served some six years of a 20–40 year jail sentence following pleas of guilty in April 1948 to indictments charging him with participation in 22 separate armed robberies; after getting out of jail he worked for a year as a secretary to a Dr. Vasquez, a Baptist minister, and then completed one year of study at a liberal arts college in West Virginia; he had been a Sunday school teacher and had served as vice-president of the Youth Fellowship of his church which he attended regularly.

Second, as to Scoleri's "conduct" at his trial:

When Scoleri took the stand in his own defense, his counsel, Colonel Colbert C. McClain (a former assistant district attorney), almost immediately proceeded to examine him with respect to damaging state's evidence that he had given shelter to one Ricky Woods who had been wounded by a pistol shot while participating in the robbery-murder for which Scoleri was being tried and that Woods had died without receiving any medical attention and was subsequently given furtive burial by Scoleri and his brother Edward [10] in a shallow grave which they dug with improvised implements in a wooded area in New Jersey. Scoleri readily admitted the truth of the state's evidence as outlined, and, in the course of doing so, gave the following "explanation" of his failure to take Woods to a hospital when he was unable to get a doctor to treat him:

"  *   *   *   I asked Dante [Scoleri's brother] to take Ricky and me to the hospital to get some medical

---

200 F.Supp. 557 (E.D.Pa.). The proceedings in the District Court were filed subsequent to the denial of Rucker's application for certiorari by the United States Supreme Court, supra, note 8.

10. Edward Scoleri had also been indicted as a participant in the robbery-murder but had been granted a severance (separate trial) on his application. He subsequently pleaded guilty and was sentenced to life imprisonment.

attention, and he exclaimed, *'Tony, with your record they will never believe you weren't there.* You can't be involved, Don't get involved,' he screamed.

"I said, 'The man needs help'.

"He said, 'I don't want to have anything to do with it, and I suggest you don't have anything to do with it.' "

With respect to his participation in Woods' macabre burial, Scoleri, in response to his counsel's question: "Why did you do that, Tony", made this reply:

"Eddie was a total mess. He was in a stupor. He had been drinking rather heavily, and at the apartment he was drinking even more, and he was completely numb. He didn't know what to do, and he begged me to help him. He said, 'Help me, Tony.'

" * * * *  *So I told him I had my back time, 30 years—30 years parole hanging over my head,* and there wasn't much I could do without becoming involved.

"Eddie broke down and cried, and he said, 'I don't know what to do'."

After Scoleri's counsel elicited the information that Edward was his "baby brother" he asked him:

Q. "Did you want to help your brother?

A. "I did, sir.

Q. "Is that the reason why you did these subsequent things after Ricky Woods died?

A. "Yes."

The foregoing establishes, as earlier stated, that Scoleri's prior criminal record was invoked by him as part of his "defense" of undisputed conduct which the jury could properly find, as it did, involved him in the commission of the robbery-murder. That being so, under the principles stated, Scoleri *waived* and/or *cured* the fundamental error which the majority holds was committed in the admission of evidence of his prior criminal record in the presentation of the state's case.

Still another instance must be cited of Scoleri's invoking of his prior criminal record as part of his "defense". A state witness, Richard Febo, had testified that Scoleri, on the day of the robbery-murder, had shown him two revolvers which he said were to be used by him in a hold-up or armed robbery and had invited him to participate, but he declined. In an apparent effort to discredit Febo's testimony Scoleri was asked by his counsel:

Q. "Who is Richard Febo?

A. "Richard Febo was my accomplice when we were arrested in 1948 for a series of armed robberies.

Q. "Do you know of your own knowledge how much back time Febo has?

A. "He has 30 years' back time."

Scoleri then testified that when Febo, with whom he had served in jail, "first came home from prison he was unstable emotionally and distraught * * * given to outbursts of temper and crying spells", and he introduced him to Dr. Vasquez "for some spiritual aid".

It is of course obvious that again Scoleri premised a defense maneuver with respect to Febo's testimony on his "concern" for this "emotionally and distraught" man, and that a necessary ingredient of the defense strategy was the establishment of their past common criminal association.

It may further be observed that Dr. Vasquez was called by the defense to corroborate Scoleri's testimony that Febo was an unreliable witness. He testified that Scoleri brought Febo to see him at one time and said to him, "Here is a boy who is very badly mixed up. Let us see if we can help him". In doing so Dr. Vasquez testified preliminarily that Scoleri "did fine work for me *when he came out of the penitentiary*". Here again a Scoleri defense witness testified as to his prior criminal record thus waiving or

curing the "fundamental error" condemned by the majority.[11]

There remains only this to be said.

The federal due process clause which was designed to protect the innocent should not be discredited by its use to afford "mere technical loopholes for the escape of the guilty." Stein v. New York, 346 U.S. 156, 196–197, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953). It was there said (p. 197, 73 S.Ct. p. 1099):

> "The petitioners have had fair trial and fair review. The people of the State are also entitled to due process of law."

In the instant case Scoleri had a "fair trial and fair review" by the Supreme Court of Pennsylvania. The people of the State of Pennsylvania "are also entitled to due process of law".

For the reasons stated I would affirm the Order of the District Court denying Scoleri's petition for the writ of habeas corpus.[12]

STALEY, Circuit Judge, joins in the foregoing.

HASTIE, Circuit Judge (dissenting).

Concurring specially in United States ex rel. Thompson v. Price, 3 Cir., 1958, 258 F.2d 918, 922, I expressed the view that, but for the defendant's acquiescence, it would have been gravely unfair to permit the introduction of his prior criminal record during the course of his trial and before the determination of guilt or innocence, since the only legitimate function of that evidence, guidance in the imposition of sentence, could as well have been achieved by its introduction after guilt had been determined. This case presents the same basic question.

It is true, as Judge KALODNER points out in his dissent here, that there are various situations in which courts have admitted evidence during a criminal trial which has both a legitimate function and a probable prejudicial effect. But in those cases, in order to get before the jurors certain information which they should have, it was necessary to risk the prejudice which this information might create. What makes the present case different is the fact that there was an easy, simple and obvious way of achieving the legitimate effect of the evidence of prior convictions without subjecting the defendant to its prejudicial effect on the issue of guilt or innocence. It seemed to me in the Thompson case and it seems to me now that it is unfair for a state to employ a seriously prejudicial procedure when an obviously satisfactory non-prejudicial alternative is available.

However, there is one line of cases, which did not have to be considered in the Thompson appeal because of the defendant's acquiescence, which must be considered here. This is the line of Supreme Court decisions sustaining habitual offender statutes. Under some of those statutes, the procedure has been to present evidence of prior convictions to the jury along with the evidence of the alleged new offense. In other cases, evidence of prior crime has not been introduced until after conviction. The significant thing is that the Supreme Court

11. I have not adverted to the circumstance that Scoleri's counsel had brought to light his criminal past in cross-examination of Ida Iocco, a state witness, long before the state introduced into evidence the mooted criminal record, because in my opinion it is unnecessary to rely on it in view of the conduct of the defense in making Scoleri's criminal record a vital defense factor thus waiving or curing the state's error, if error it be.

It was on cross-examination of Mrs. Iocco that the defense elicited the statement that Febo "was in prison with Tony [Scoleri]". Mrs. Iocco had not on the state's direct examination even mentioned Febo or made any statement with respect to Scoleri's prison service.

12. The majority has noted that "Judge Goodrich participated in the consideration of this case but died prior to the filing of this opinion." It should be noted that at the conference following oral argument of this appeal Judge Goodrich voted to affirm the Order of the District Court denying the writ of habeas corpus.

has sanctioned both procedures with no indication that the prejudice inherent in one amounts to a constitutional defect. Graham v. West Virginia, 1912, 224 U. S. 616, 32 S.Ct. 583, 56 L.Ed. 917; McDonald v. Massachusetts, 1901, 180 U.S. 311, 21 S.Ct. 389, 45 L.Ed. 542; Moore v. Missouri, 1895, 159 U.S. 673, 16 S.Ct. 179, 40 L.Ed. 301. More recently, in Chandler v. Fretag, 1954, 348 U.S. 3, 75 S.Ct. 1, 99 L.Ed. 4, the Supreme Court considered a conviction under the Tennessee habitual offender statute which contained the prejudicial feature of introducing the evidence of prior crimes before a determination whether the accused was guilty of the alleged new offense. The Court took note that the determination of prior convictions and the trial on the new offense "may be conducted in a single proceeding" before the trial jury. 348 U.S. at 8, 75 S.Ct. at 4. While the contested issue on that appeal was an alleged denial of the right to counsel, the presently significant fact is that the Court ordered a new trial to be conducted under the Tennessee procedure of submitting evidence of prior convictions to the jury during the course of the trial.

The prejudice involved in the procedure under such habitual offender statutes and the obvious availability of a non-prejudicial alternative are as clear and as serious as the avoidable prejudice to which Scoleri has been subjected. So long as the Supreme Court sanctions the one procedure it seems to me that an inferior court is not justified in holding the other unconstitutional. We are faced with the always difficult question whether undesirable state practice is so bad as to be intolerable. I am constrained to follow the teaching of the Supreme Court in the habitual offender cases that such an undesirable practice as we have here is tolerable although, without that guidance, I would be disposed to reach the opposite conclusion.

The majority opinion distinguishes the Supreme Court cases upholding the habitual offender statutes on the ground that conviction under those statutes merely results in very long terms of imprisonment, life imprisonment in many cases, while Scoleri has been sentenced to death. I do not believe that the habitual offender cases turn upon this distinction between death and long term imprisonment. However, it is true that such cases as Betts v. Brady, 1942, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595, indicate that the Supreme Court is less reluctant to condemn state procedure as a denial of due process when human life is at stake than when imprisonment only is involved. But I can find nothing in the habitual offender cases that in any way suggests a judicial conclusion that the procedure in question was disturbingly unfair, but not quite unfair enough to warrant federal interference with the state conviction because the litigation did not involve a death penalty. Rather, the Court seems to have felt that the use of prior conviction evidence during the trial of the issue of guilt or innocence was not the sort of extreme unfairness which could in any case amount to denial of due process of law. Moreover, underlying the Betts v. Brady line of cases on the right of indigents to counsel is the consideration that the providing of suitable professional representation for every indigent person accused of a non-capital crime does involve practical difficulties and would impose a great burden upon the bar. No such consideration is involved here. For these reasons, I am not persuaded by the undertaking of the majority to distinguish the habitual offender cases.

Finally, I do not agree with Judge KALODNER's view that Scoleri "waived" his objection to the introduction of his criminal record. That argument is based upon references made to the defendant's earlier crimes during the course of his defense after the elaborate and prejudicial criminal record had been introduced in evidence, over strenuous objection, during the course of the government's case in chief. I can find neither reason nor justice in a ruling which would give such detrimental effect to the defendant's effort to make the best of a

bad situation after it had been created over his objection. My dissent is based solely upon my judgment that the habitual offender cases control the constitutional issue in this case.

On Petition for Rehearing and on Petition for Leave to Intervene Amicus Curiae and to File a Praecipe for Appearance.

Before BIGGS, Chief Judge, and McLAUGHLIN, KALODNER, STALEY, HASTIE, GANEY, and SMITH, Circuit Judges.

## PER CURIAM.

In view of the petition for rehearing we must re-emphasize the principles inhering in our decision. The Commonwealth introduced into the record in its case in chief, as we have stated, Scoleri's twenty-five prior unrelated convictions of, or pleas of guilty to, charges of robbery with violence. The admission of this evidence was duly objected to on constitutional grounds. The issue of Scoleri's guilt as well as the penalty to be imposed on him were both before the jury for determination. Scoleri's defense was an alibi and he attempted to prove that witnesses who testified that he was at the scene of the crime had made a mistake in identification. In short, the issue of identification was vital. On this state of facts we held that the introduction into evidence of the twenty-five prior unrelated convictions of, or pleas of guilty to, charges of robbery with violence were so prejudicial, so unfair, as to constitute a denial of due process of law to Scoleri.

We have stated the foregoing to make it clear that every case which involves the delicate balance of comity between the courts of a state and those of the federal system must be considered and decided on its own precise facts. In the case at bar we did not lay down a rule of evidence for the Pennsylvania State tribunals. We handed down a judgment as to the fundamental fairness or unfairness of what was done in this particular case.

As to the contention that this court was evenly divided in opinion and that therefore the decision of the court below must stand, we will state the following. An expression of a point of view by a member of this court at conference is tentative. The vote of a member of this court on the disposition of an appeal occurs after the proposed opinion of the court is circulated and does not become effective until the opinion of the court is filed. Judge Goodrich died before the circulation of the opinion in this case and therefore did not vote.

In the light of all the circumstances we can perceive no valid reason for permitting the President of the District Attorneys Association of Pennsylvania to intervene *amicus curiae* and to file a *praecipe* for appearance even though we assume, without deciding, that the Association's President possesses *locus standii* in the instant proceeding.

The petitions will be denied.

KALODNER, Circuit Judge (concurring).

I have joined in the denial of the petition for rehearing since all the points raised in it with the exception of that which relates to the "failure to count the vote" of our deceased brother, Goodrich, have already been considered by the Court en banc.

I must add that I deem the point raised with respect "to the failure to count the vote of Judge Goodrich" to be without merit.