**UNITED STATES of America ex rel. John BERKERY**

v.

**Alfred RUNDLE, Warden, Eastern State Correctional Institute, Philadelphia, Pennsylvania.**

**Misc. No. 2652.**

United States District Court
E. D. Pennsylvania.
Feb. 25, 1964.

Robert F. Simone, Philadelphia, Pa., for petitioner.

JOSEPH S. LORD, III, District Judge.

On October 9, 1959, John Berkery, who is now petitioning for a writ of habeas corpus, was convicted of an attempt to commit burglary, possession of burglary tools, and conspiracy. His case was tried in the Court of Quarter Sessions of Philadelphia County by the Hon. William I. Troutman, sitting without a jury. Following his conviction, relator successively filed (1) a motion for a new trial with the trial court, which was denied; (2) an appeal to the Superior Court of Pennsylvania, which affirmed the judgment of sentence (Commonwealth v. Berkery, 200 Pa.Super. 626, 190 A.2d 572); (3) a petition for allocatur in the Supreme Court of Pennsylvania, which was denied without opinion; and (4) a petition for certiorari in the Supreme Court of the United States, which was denied (84 S.Ct. 484). I have before me (1) the record filed in the Superior Court of Pennsylvania, which includes the transcript of the trial; (2) the briefs in the Superior Court; (3) the petition for allocatur; and (4) the relator's brief in support of the petition for certiorari. From all of these, the following appears:

In the course of Berkery's trial, a Commonwealth witness, on re-direct examination, was asked in whose car the witness was driven home on the night of the burglary. Her answer was apparently at variance with what she had allegedly said in a previous signed statement given to the Commonwealth. Thereupon, the following colloquy occurred:

"MR. HARRIS: If the Court, please, I am going to plead surprise and ask leave to cross-examine the witness, because in a statement given to me in person, and in a statement given here, she led me to believe, according to the statement, that they drove home in John Berkery's car. And I would like to show her this statement and cross-examine her on the plea of surprise.

"I would like not to divulge the contents of the entire statement. I think the only question I would like to examine on is the question of whether or not they drove home in her car or John Berkery's car. I have the very paragraph marked off here. It's one simple sentence. I would rather not divulge the particular contents, Your Honor, unless counsel wants to open his file to me. But that doesn't seem to be a two-way street.

"MR. DONOLOW: This is most unusual. Here is the district attorney pleading surprise on a statement—

"MR. HARRIS: Only as to one purpose.

"MR. DONOLOW: If you open it to one, you open it all up.

"MR. HARRIS: I have heard that, but I don't believe it.

"MR. DONOLOW: The Courts say that you can't use it for only

one purpose. As a matter of fact, I would have a right to have you give me this statement, if I knew you had a signed statement, before she testified.

"MR. HARRIS: I don't agree with you at all. The purpose of this is not for any substantive evidence. It only goes to her credibility. And, therefore, if she testified on another occasion different from what she is swearing to now, I am permitted to impeach the witness on that ground only—not as to everything she ever said in her life. And that is the only ground, whether they drove home in her car or John Berkery's car.

"THE COURT: Note your objection.

"MR. DONOLOW: I don't object to that. He is objecting to my reading the statement. If he wants to impeach her, his own witness, it's all right with me.

"MR. HARRIS: Well—

"THE COURT: Well, of course, we have to find out something about when she made this other statement.

"MR. DONOLOW: That's right. Mr. Harris is objecting to my reading this statement that she signed, and I feel I have a right to read this statement.

"MR. HARRIS: I only want him to read the relevant part. There are other things there that are not relevant to his case or to my case.

"THE COURT: Well, we don't want anything irrelevant coming in. Was that statement taken in connection with this case?

"THE WITNESS: May I say something?

"THE COURT: Pardon?

"THE WITNESS: May I say something?

"THE COURT: Not right now. May I look at that statement?

"MR. HARRIS: I think Your Honor may be able to tell that there is some material on the second page that might be harmful to our position. It would be of no benefit to the defendant's case, and it's strictly irrelevant, has nothing to do with the factual situation in this case.

"MR. DONOLOW: If it is harmful to your position, I would like to see it.

"MR. HARRIS: I say it is harmful to some other facets of this case and the investigation.

"THE COURT: The only trouble is I fear that if there is a general examination as to the statement we are going to bring in a lot of irrelevant material that may be harmful to both sides. I just finished reading a statement here that—perhaps I shouldn't read this, because I am the jury—particularly conversation about the co-defendant, who is now deceased.

"MR. HARRIS: That's the part I want to keep out.

"THE COURT: Let's go to what the contradiction was, if there is any. Maybe there isn't any. Maybe she will explain it. I don't know."

After relator's conviction and denial of his motion for a new trial, relator appealed to the Superior Court. Among the questions raised, the only one which concerns this proceeding was: "Did the Trial Judge Err in Failing To Order the Case Tried With a Jury When He Became Aware During the Trial of the Identity of the Defendant?" The Superior Court affirmed, saying as to this question (200 Pa.Super. at page 630, 190 A.2d at page 574):

" * * * We are satisfied that the trial judge decided the case on the evidence, that he zealously protected the defendant's interests and that he was not prejudiced or influenced in his decision by the statement he read or the knowledge he obtained

concerning the identity of the defendant. * * *"

Following the affirmance, relator filed a petition for allocatur in the Supreme Court of Pennsylvania. Here for the first time, constitutional questions were raised. Relator asserted, in essence, that in view of United States ex rel. Scoleri v. Banmiller, 310 F.2d 720 (C.A.3, 1962), his trial was fundamentally unfair in violation of the Fourteenth Amendment. This question, in constitutional context, clearly was not presented to nor passed upon by the Superior Court. There have been no state habeas corpus proceedings. Several questions are at once apparent:

(1) Procedurally, has relator exhausted state remedies?

(2) Substantively:

(a) Sufficiency of the requisite trial objection.[1]

In United States ex rel. Thompson v. Price, 258 F.2d 918 (C.A.3, 1958), this circuit held that no ground for federal habeas existed where relator's prior criminal record came before the factfinder without objection. In United States ex rel. Scoleri v. Banmiller, supra, the court said, at page 725 of 310 F.2d:

"* * * This court, as presently constituted, limits the position that it took in United States ex rel. Thompson v. Price to cases in which the defendant did not object to the admission into evidence of his prior record of unrelated criminal convictions. * * *"

Was the objection here sufficiently directed to the revelation of relator's other offenses to bring his case without Thompson and within Scoleri?

(b) Is there now a distinction, in the area of trial advertence to other offenses, between capital and non-capital cases?

The Supreme Court of the United States has found no constitutional bar to the introduction of prior criminal records under habitual criminal statutes. See Moore v. Missouri, 159 U.S. 673, 16 S.Ct. 179, 40 L.Ed. 301 (1895); McDonald v. Massachusetts, 180 U.S. 311, 21 S.Ct. 389, 45 L.Ed. 542 (1901); Graham v. West Virginia, 224 U.S. 616, 32 S.Ct. 583, 56 L.Ed. 917 (1912).

As to these cases, the court in Scoleri said (page 724 of 310 F.2d):

"* * * Under the habitual criminal statutes the Supreme Court of the United States has permitted evidence of prior unrelated crimes to come before a jury. But the admission into evidence of these prior convictions could, at most, subject the defendant to an additional prison term as a recidivist. The case now before us involved a trial for a capital crime, a crime punishable by death. To say that such evidence is permissible in the former situation and therefore *a fortiori* in the latter, is to ignore the crucial distinction between a trial which could result only in a prison sentence and one which could and in this case did lead to the imposition of the death penalty. The Supreme Court has recognized clearly the validity of this kind of distinction in Betts v. Brady, 316 U.S. 455, 462, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942). * *"

However, Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), was decided after Scoleri. That case specifically overruled Betts v. Brady, and certainly obliterated the capital vs. non-capital distinction in right to counsel cases. Other cases had similarly found no constitutional distinction between death and deprivation of liberty. Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956); Kinsella v. United States, 361 U.S. 234, 80 S.Ct. 297, 4 L.Ed.2d 268 (1960); Ferguson v. Georgia, 365 U.S. 570, 81 S.Ct. 756, 5 L.Ed.2d 783 (1961). Are the recidivist cases still viable, or are they like Betts v. Brady, in the words of Mr. Justice Harlan, now entitled "to a * * * respectful burial"? Does this circuit's

---

1. The entire colloquy and the only reference in the record to the use of the statement, which referred to other offenses, is set forth in full, supra.

somewhat oblique distinction between capital and non-capital cases in Scoleri now compel a distinction here? Cf. United States ex rel. Stoner v. Myers, 219 F.Supp. 908 (E.D.Pa., 1963).

(c) Does it make a difference that the fact-finder who heard (or read) the allegedly prejudicial references to other offenses was an experienced judge instead of an untutored jury of laymen? On this question, judges themselves seem to differ. Judge Woodside, of the Superior Court, said in Commonwealth v. Berkery, 200 Pa.Super. 626 (1963), at pages 629–630, 190 A.2d 572, at pages 573–574:

"* * * When a judge is hearing a case without a jury, he should try to avoid receiving knowledge concerning the case and the parties which would be denied to a jury, but this is not always possible. In order to rule on the admission of evidence, a trial judge must sometimes obtain information he would not submit to a jury, and this is true when he is trying a case without a jury as well as when he is trying a case with a jury. Judges are human, but they are also specially trained to decide cases on the evidence. They are conscious of the dangers of irrelevant facts and zealously guard themselves against being influenced by any facts not obtained from the evidence. Furthermore, just as it is impossible in some notorious cases to obtain jurors who know nothing of the defendant and the crime, so is it impossible for a judge to be free of all knowledge concerning notorious crimes and defendants. * * *"

In Scoleri, Judge Biggs said, at page 725 of 310 F.2d:

"* * * we cannot believe that the procedural scheme imposed by Section 701 of the Criminal Code of 1939 and the 'Parker Rule' would permit the jurors to put the knowledge of Scoleri's twenty-five convictions or pleas of guilty out of their minds while considering his guilt or innocence. Certainly such a feat of psychological wizardry verges on the impossible even for berobed judges. * * *"

This latter, however, was clearly dictum, for Scoleri was tried to a jury. Will a federal court, when squarely presented with the problem, eschew commendable modesty and grant that a judge who can (allegedly) cast aside irrelevancies in the solution of legal questions is equally able to do so in the solution of factual questions?

I am convinced that the state courts of Pennsylvania have not had an opportunity to review and pass upon the constitutional impact of these substantive questions. The alleged error was presented to the Superior Court in the narrow framework of an ordinary motion for a new trial; its constitutional context was never delineated. Under this circumstance, the denial of the petition for allocatur adds nothing to relator's petition. It does not mean that the Supreme Court passed upon the constitutional questions raised there for the first time. In Clarion Borough Petition, 275 Pa. 175, 176, 118 A. 765, (1922), the entire per curiam opinion of the court said:

"This is an appeal from the Superior Court, allowed because a constitutional question was alleged to be involved; but the record shows no such point presented to that tribunal. Neither the statement of questions involved, the assignments of error in, nor the opinion of, the Superior Court, mentions, or indicates, a constitutional point. Under such circumstances, appellants have no standing to be heard in this court. Chartiers Creek Bridge, 235 Pa. 365, 84 Atl. 351.

"The appeal is dismissed, at the cost of appellants."

That is this case.

I have adverted to the unresolved substantive question that I am able to discern here solely for the purpose of indicating that Berkery's claim of constitutional infringement is not clearly

without merit. United States ex rel. Drew v. Myers, 327 F.2d 174 (C.A.3, 1964). This is no indication of any belief on my part that his claim does or does not have final merit. It means merely that the questions exist, but that I restrain myself at this juncture from deciding them. "The reason for this restraint lies in the belief that the federal courts would avoid 'unseemly collisions' by allowing the state courts first opportunity to review alleged state abuses of federal constitutional rights." United States ex rel. Drew v. Myers, 174 F.2d 327 (C.A.3, 1964).

The state courts have not yet had that opportunity here. It follows that state remedies have not been exhausted and the petition, on that ground,[2] must be denied.

---

2. See United States ex rel. Drew v. Myers, supra.