Commonwealth ex rel. Marino, Appellant, v. Myers.

Submitted April 20, 1965. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Thomas Marino,* appellant, in propria persona.

*Ted E. Freedman* and *Joseph M. Smith,* Assistant District Attorneys, *F. Emmett Fitzpatrick, Jr.,* First Assistant District Attorney, and *James C. Crumlish, Jr.,* District Attorney, for appellee.

OPINION BY MR. JUSTICE ROBERTS, November 23, 1965:

Appellant is presently serving a life sentence following his 1947 jury conviction of murder in the first degree.[1] He filed a petition for a writ of habeas corpus

---

[1] No direct appeal was taken from this conviction, a post trial motion for a new trial having been withdrawn.

in the court below contending that the introduction at his trial of evidence of prior convictions, under the then prevailing "Parker Rule",[2] resulted in a denial of due process and invalidated his conviction.[3] The petition was dismissed[4] and this appeal followed.

Upon examination of the record, we conclude that the court below did not err in dismissing appellant's petition. However, in light of the recent decision in *United States ex rel. Johnson v. Rundle*, 243 F. Supp. 695 (E.D. Pa.), aff'd on the opinion below, 349 F. 2d 416 (3d Cir. 1965) (per curiam),[5] we deem it appropriate to add a few observations in support of our conclusion.

Appellant, married and the father of two daughters, was charged with the murder of James Landi, a 17 year old youth. The slaying arose out of circumstances engendered by a belief on the part of appellant that the deceased had seduced his youngest daughter. Resent-

---

[2] The "Parker Rule" permitted, in first degree murder cases, evidence of a defendant's prior unrelated convictions to be submitted to the jury during the Commonwealth's case in chief for the purpose of assisting the jurors in fixing the penalty at death or life imprisonment in the event they found the defendant guilty of murder in the first degree. See *Commonwealth v. Parker*, 294 Pa. 144, 143 Atl. 904. (1928), interpreting the Act of May 14, 1925, P. L. 759, §1, 18 P.S. §2222. This procedure was modified by the enactment of the Split-Verdict Act, Act of December 1, 1959, P. L. 1621, §1, 18 P.S. §4701, under which evidence of unrelated convictions may be admitted only in a supplementary hearing held for the purpose of fixing the penalty after guilt has been ascertained.

[3] In his petition for the writ, appellant also contended that certain testimony at trial was perjured. This contention has not been pursued on this appeal.

[4] The court below held a show cause hearing but, since it was believed that no factual issue requiring the taking of testimony existed, appellant was not present. See Act of May 25, 1951, P. L. 415, §5, 12 P.S. §1905.

[5] The *Johnson* decision was rendered subsequent to that of the court below.

ful, appellant sought out Landi at his place of employment and requested that Landi accompany him to his home to discuss the matter. Acceding to the request, Landi, attended by a friend, accompanied appellant home. Once there, appellant produced a gun which he had kept concealed in the house and, after striking Landi a number of blows to the head with the weapon, fatally shot him in the chest.

The Commonwealth, seeking a first degree murder conviction and the death penalty, endeavored at trial to prove a premeditated design on the part of appellant to kill Landi. Appellant did not controvert the shooting but asserted that it had not been premeditated, that he had intended merely to frighten the deceased and had been provoked into firing the fatal shot by certain alleged derogatory remarks made by Landi regarding appellant's daughter. All that was sought by the defense was to secure a reduction of the offense to murder in the second degree.[6] No serious attempt to obtain an acquittal was made.

Near the conclusion of its case, the Commonwealth introduced into evidence three prior convictions[7] to assist the jury in fixing the penalty in the event appellant was found guilty of murder in the first degree.[8] The jury was properly cautioned that such evidence

---

[6] Under Pennsylvania law, mere words of provocation are not sufficient to reduce a charge of murder to voluntary manslaughter. See *Commonwealth v. Cisneros*, 381 Pa. 447, 451-52, 113 A. 2d 293, 295 (1955) ; *Commonwealth v. Newson*, 277 Pa. 48, 51-52, 120 Atl. 707, 708 (1923). Hence, the net effect of the defense asserted could only be to reduce the offense from murder in the first degree to murder in the second degree.

[7] Introduced at trial were a 1928 conviction for aggravated assault and battery, a 1937 conviction for carrying a concealed deadly weapon, and a 1938 conviction for assault and battery with the intent to kill.

[8] Timely objection was made by defense counsel to the introduction of appellant's prior convictions.

was admitted for that limited purpose and was not to be deemed relevant on the issue of guilt.

In determining whether the introduction of appellant's prior convictions was sufficiently prejudicial as to constitute a denial of due process, the court below applied the type of factual analysis adopted by the Court of Appeals for the Third Circuit in *United States ex rel. Scoleri v. Banmiller,* 310 F. 2d 720 (3d Cir. 1962), cert. denied, 374 U.S. 828 (1963), and *United States ex rel. Rucker v. Myers,* 311 F. 2d 311 (3d Cir. 1962), cert. denied, 374 U.S. 844 (1963).[9] Such analysis, it concluded, failed to support appellant's contention that his constitutional rights had been infringed by the introduction at trial of his prior record. We are in agreement with that conclusion and deem the result consistent with the decision in *United States ex rel. Johnson v. Rundle,* supra.

The *Johnson* case arose out of a train derailment in 1948 in which two trainmen were killed. Although investigation disclosed that the derailment was the result of an intentional tampering with the tracks, no evidence was uncovered as to the party or parties responsible. Finally, suspicion was directed to the defendant Johnson solely by reason of the fact that he had been convicted of a similar offense, "Obstructing a Railroad", in the State of Delaware some seven years previously.

Having located Johnson in the custody of authorities in South Carolina where he was being detained for "illegal entry", the police secured his voluntary return to Pennsylvania on the pretext that he was wanted in connection with a parole violation. While in custody in Pennsylvania, Johnson signed two statements ad-

---

[9] The district court in *United States ex rel. Johnson v. Rundle,* 243 F. Supp. 695 (E.D. Pa.), aff'd on the opinion below, 349 F. 2d 116 (3d Cir. 1965), applied a similar factual analysis.

mitting to having tampered with the track, and reenacted the event. However, at no time prior to his statements or reenactment was Johnson informed by the authorities that in fact a derailment had resulted and that he was being detained in connection with a charge of murder.

At trial, the Commonwealth offered no direct proof of Johnson's guilt. The only evidence connecting him with the crime consisted of his statements and testimony surrounding the reenactment. Johnson, however, repudiated both the statements and the reenactment, contending that he had been persuaded by the authorities that the admission of the removal of a few railroad spikes would result in less onerous treatment in Pennsylvania than he was likely to receive in connection with the charge in South Carolina.

He testified that the contents of the statements and the reenactment were suggested to him by the authorities. In addition, a number of witnesses testified in support of Johnson's contention, disputed by the Commonwealth, that he had been 170 miles from the scene of the wreck during the crucial time period.

During the course of the trial, the Commonwealth introduced into evidence under the "Parker Rule" Johnson's prior record, including the Delaware conviction for obstructing a railroad which had initially focused suspicion upon him.[10] This was done even though the Commonwealth was not seeking the death penalty

---

[10] Investigation had revealed that the derailment for which Johnson was being tried was accomplished by the use of tools taken from a nearby railroad toolhouse. One of the convictions introduced at trial, a 1937 burglary conviction, involved the theft of railroad property and the Delaware conviction for obstructing a railroad involved facts strikingly similar to those presented in the Pennsylvania derailment. *United States ex rel. Johnson v. Rundle*, 243 F. Supp. 695, 697, 698 (E.D. Pa.), aff'd on the opinion below, 349 F. 2d 416 (3d Cir. 1965).

and even though the composition of the jury made such sentence improbable.[11]

In granting the writ, the district court in *Johnson* concluded that the totality of the circumstances were such as to have impaired Johnson's right to a fair trial. *United States ex rel. Rucker v. Myers,* supra, was distinguished, not only on the ground that in *Johnson* there were significant evidentiary conflicts presented for the jurors, the resolution of which may have been affected by an awareness of the defendant's prior record, but also, and more significantly, on the ground that the precise nature of the prior record, the unique and striking similarity of the crimes, made the probability of prejudice overwhelming: "[N]ot only was there a realistic probability of prejudice, but I fear that the unusual nature of defendant's prior record may have removed all doubt from the jurors' minds on the question of guilt." *United States ex rel. Johnson v. Rundle,* 243 F. Supp. 695, 697 (E.D. Pa.), aff'd on the opinion below, 349 F. 2d 416 (3d Cir. 1965).

As we view the decision in *Johnson,* the court was concerned that any doubt in the minds of the jurors as to Johnson's guilt engendered by the Commonwealth's exclusive reliance upon a repudiated confession—a confession obtained from a man of limited educational resources[12] with neither knowledge of the true nature of the crime for which he was being held nor the benefit of counsel—may have been resolved against him merely by reason of their awareness of his prior conviction for a rare and strikingly similar

---

[11] Although at voir dire, the foreman of the jury had indicated his opposition to capital punishment, he was not challenged by the Commonwealth. *United States ex rel. Johnson v. Rundle,* 243 F. Supp. 695, 698 (E.D. Pa.), aff'd on the opinion below, 349 F. 2d 416 (3d Cir. 1965).

[12] Johnson had received only a seventh grade education.

crime.[13] Given such circumstances, the qualitative effect of the relationship between Johnson's prior record and the crime for which he was being charged was sufficient in the court's view to place the case within the ambit of *United States ex rel. Scoleri v. Banmiller,* supra.[14] We view the result in *Johnson* as dictated by the critical intersection and cumulative effect of the following factors: (1) the exclusive reliance of the Commonwealth upon a repudiated confession; (2) the existence of a significant dispute as to guilt; (3) the failure of the Commonwealth to seek and its probable inability to obtain the death penalty; and, most significantly (4) the unique and striking similarity between the prior conviction and the crime charged. Such a potentially prejudicial configuration, in the view of the district court, compelled the invalidation of Johnson's conviction.

In the instant case, an examination of the record does not disclose a sufficient likelihood of prejudice to justify the conclusion that appellant's constitutional rights were infringed by the introduction at trial of his prior convictions. The only real issue presented for the jury was the degree of appellant's guilt. The only factual question was whether, in shooting Landi, he had acted in response to provocative conduct or as the result of a premeditated design. In weighing the likelihood that the jury, in resolving these matters,

---

[13] In *Johnson,* the court pointed out that the trial court, in its opinion denying a new trial, had stated that there were perhaps only three known train wreckers in the United States. *United States ex rel. Johnson v. Rundle,* 243 F. Supp. 695, 699 (E.D. Pa.), aff'd on opinion below, 349 F. 2d 416 (3d Cir. 1965).

[14] "The facts of the instant case cry even louder for a new trial than those which impelled the Court of Appeals to grant a new trial in Scoleri." *United States ex rel. Johnson v. Rundle,* 243 F. Supp. 695, 699 (E.D. Pa.), aff'd on opinion below, 349 F. 2d 416 (3d Cir. 1965).

were influenced by the fact of appellant's prior convictions, it is significant to note that the overwhelming weight of the evidence tended to discredit appellant's version of the events. The testimony of the sole eyewitness to the prelude to the shooting contradicted appellant's assertion that he had acted in response to Landi's provocative conduct. Moreover, in response to appellant's assertion that he had secured the gun merely to frighten Landi, it was established that appellant was considerably larger than his victim and had at one time been a prize fighter. Finally, the Commonwealth established that appellant, in a statement given to the police shortly after the shooting, had not made mention of any derogatory or provocative remarks on the part of the deceased.[15]

Unlike the doubt that was present in *Johnson,* the evidence of premeditation, the only real controverted issue, was both direct and abundant. Furthermore, in the instant case, the Commonwealth was seeking the death penalty and the composition of the jury, as revealed by the record, made such penalty a realistic possibility. And, although two of appellant's prior convictions involved crimes against the person, they were neither so strikingly uncommon or sufficiently similar to the offense charged as to create the danger present in *Johnson.* Moreover, we are not here confronted with a situation like that presented in *United States ex rel. Scoleri v. Banmiller,* supra. The convictions introduced at appellant's trial, by their nature and number, neither quantitatively nor qualitatively created the danger produced by those introduced in *Scoleri.* In light of these factors, we are unable to conclude that appellant's right to a fair trial on the issue of the degree of his guilt was impaired by the introduction of his prior convictions.

---

[15] The statement was not introduced by the Commonwealth but was used for purposes of impeachment.

We deal here with the most serious crime known to our law. In reaching our conclusion, we are not unmindful of the potential hazards presented by the pre-Split-Verdict Act practice. The enactment of that Act was a legislative response to this potential and a desirable corrective. This Court is sensitive to the need for scrupulous care in the consideration of those cases which come before us under the shadow of our former practice. But we are also mindful of our responsibility to ensure that those who have justly earned the condemnation of their peers are not the undeserved beneficiaries of a mistaken and misdirected largesse. Our system of jurisprudence has traditionally been concerned with the accommodation of the rights of the criminally accused and the rights of society. In accordance with that tradition, we seek by our review to ensure that those who by reason of a realistic probability of prejudice have been denied their constitutional right to a fair trial are afforded that right. We are not here presented with such a case.

Order affirmed.

CONCURRING OPINION BY MR. CHIEF JUSTICE BELL:

I join in the majority Opinion. However, I wish to add my conviction that a lower Federal Court Judge or Court should not have the power to nullify and, in practical effect, overrule a decision of the highest appellate Court of any State, in any case where an appeal by certiorari or otherwise may be taken to the Supreme Court of the United States by a defendant or by a person aggrieved.*

Commencing in 1952 and every year thereafter, the Chief Justices (or Chief Judges) of our 48 States (now 50), at their annual Conference have by resolution expressed their conviction that a decision of the highest

---

* With a few exceptions which are not here relevant.

Court of the State should not be reviewed or changed or nullified by any Court other than the Supreme Court of the United States, and in particular that writs of habeas corpus should not be granted by a Federal District Judge or Court where the questions involved have been or may be decided by the highest Court of a State. The deplorable results of this conflict and the resulting impairment of public confidence in Courts and in the administration of Justice, are strikingly apparent from the recent cases of *State v. La Pierre*, 39 N. J. 156 (1963) ; and *United States ex rel. Russo v. State of New Jersey*, 351 F. 2d 429 (3d Cir. 1965).

It is indisputable that respect for Law and for all Courts would be greatly enhanced if a Federal Judge who (or a Federal Court which) believes he (or it) has such absolute and complete overruling power, would refrain, under the Doctrine of Comity, from exercising it in the absence of very exceptional and controlling circumstances.