## Commonwealth *v.* Chapasco, Appellant.

Submitted January 6, 1969. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*I. Leonard Hoffman,* and *Ettinger, Poserina, Silverman, Dubin, Anapol & Sagot,* for appellant.

*Stephen B. Harris,* Assistant District Attorney, and *Ward F. Clark,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE POMEROY, November 11, 1969:

In 1950 Harry Walter Chapasco, appellant herein, was jointly indicted with Martin Joseph Pearson and Walter John Lowry for the unlawful killing of one David Sklar during the perpetration of an armed robbery. Each of the defendants was separately tried. Each was convicted of murder in the first degree and sentenced to life imprisonment. Chapasco was convicted by a jury on June 13, 1951; in rendering its verdict the jury fixed the sentence at life imprisonment and recommended that parole should never be considered. Judgment of sentence to that effect was entered on June 18, 1951.

On July 26, 1967, Chapasco filed a petition under the Post Conviction Hearing Act, Act of January 25, 1966, P. L. (1965) 1580, 19 P.S. §1180-1 et seq., in which he alleged that the admission in evidence of his prior criminal record during his 1951 trial constituted a denial of due process. After a hearing, the court below dismissed the petition on March 19, 1968. This appeal followed.

As set forth by the hearing judge (who was also the trial judge) in his opinion dismissing appellant's PCHA petition, the facts of the case are as follows:

"On the night of May 19, 1950, two men were seen prowling in the shadows behind the Safe Food Store in Croydon, Bucks County. They were requested to withdraw from the shadows by the owner of the store, whereupon each pulled his gun, forcing the owner and two other men to line up with their hands against the back of the store. One of the gunmen struck David Sklar, the decedent on the head causing him to fall. The same gunman apparently pulled the trigger of his pistol, which misfired. Thereupon the second gunman shot and killed Sklar. The two gunmen then ran

around the building to a waiting automobile which, with two passengers, sped toward Philadelphia. One of the three men who was held up behind the store was one Allen Ostroff, who at trial, said that he had a close view of the defendant and identified Chapasco as one of the gunmen. Some hours after the crime, a pistol was found near the site where the gunmen entered the automobile. The cartridge clip in the pistol was found to have a thumbprint, which thumbprint was identified at trial as being that of Chapasco. The second gun said to have been involved was later discovered in the home of Chapasco, and a ballistics expert, testifying on behalf of the Commonwealth, stated that the fatal bullet was discharged by the gun so found. After surveillance by the police for a period of time, Chapasco and Pearson were taken into custody by the police for questioning. Pearson made a lengthy written statement describing the events preceding the killing, the killing itself, and the activities of Pearson and Chapasco following the shooting. The confession states that he was the gunman who killed Sklar, that Chapasco was the other gunman and that Chapasco had pulled the trigger of his pistol, which had misfired. He then described in his statement how he and Chapasco went 'up state' and proceeded to burn the wallets which they had taken during the holdup, and then proceeded to take a hotel room in Reading, Pennsylvania. The Commonwealth's witnesses testified that Pearson's statement was read by Chapasco and also read aloud to him by the Assistant District Attorney. Following this, and after conferring with the District Attorney, Chapasco made a brief written statement in which he confirmed all of the acts set forth in the statement of Pearson. . . .

"The petitioner repudiated his statement at the time of trial but the statement is not now under attack."

Prior to the adoption of the Split-Verdict Act, Act of December 1, 1959, P. L. 1621, §1, 18 P.S. §4701, the Commonwealth was permitted to introduce evidence of a defendant's prior criminal record during its case-in-chief against a defendant on trial for murder. This procedure was sanctioned by this Court in *Commonwealth v. Parker,* 294 Pa. 144, 143 Atl. 904 (1928), and was followed in numerous cases. Under the so-called Parker rule, prior conviction evidence was not to be considered by the jury either in its determination of the fact of guilt or the degree of guilt. Rather, this evidence of a defendant's past record was admitted only "for the purpose of showing the jury the manner of man he was to aid it in fixing the penalty" in the event he was found guilty of first-degree murder. *Commonwealth ex rel. Sprangle v. Maroney,* 423 Pa. 589, 593, 225 A. 2d 236 (1967). Under the Parker rule, the trial court was required to instruct the jury with care as to the limited relevance of the admitted evidence.

The difficulty of requiring jurors to dismiss a defendant's prior criminal record from their minds when deciding the issue of guilt while permitting them to consider such evidence for some other purpose is clear. Even with careful instructions from the trial court, allowance of such evidence may lead to a confusion of issues. Jurors may be over-persuaded by evidence of past criminal conduct, prejudge a defendant with a bad general record, and deny him a fair opportunity to acquit himself of a particular offense. Indeed, Judge Biggs has called the jurors' need to put knowledge of a defendant's extensive record out of mind while considering his guilt or innocence "a feat of psychological wizardry [which] verges on the impossible even for berobed judges." *United States ex rel. Scoleri v. Banmiller,* 310 F. 2d 720, 725 (3d Cir. 1962), *reh. denied,*

310 F. 2d 736 (3d Cir. 1962), *cert. denied,* 374 U.S. 828 (1963). And Judge LEARNED HAND in a similar case termed the task of jurors instructed to consider evidence for one purpose while disregarding it for another "a mental gymnastic which is beyond, not only their powers, but anybody's else." *Nash v. United States,* 54 F. 2d 1006, 1007 (2d Cir. 1932), *cert. denied,* 285 U.S. 556 (1932).

Accordingly, it is not surprising that convicted defendants have claimed that the introduction of evidence of their prior criminal records before a determination of their guilt constitutes a denial of that due process of law which is guaranteed them by the Fourteenth Amendment to the Constitution of the United States.

Such a claim is now before us, and the threshold issue we face in disposing of appellant Chapasco's appeal is a determination of the meaning and effect of the United States Supreme Court's decisions in *Spencer v. Texas,* 385 U.S. 554 (1967), *reh. denied,* 386 U.S. 969 (1967), and its progeny.

In *Spencer* the Supreme Court reviewed a due process challenge to trial procedures employed by Texas in the enforcement of its recidivist or habitual-criminal statutes.[1] Those procedures permitted the State to in-

---

[1] The Court in *Spencer* cited a conflict in the circuits on the constitutionality of similar state procedures as its reason for granting certiorari and undertaking its review of the challenged Texas procedure. It further stated that the Court of Appeals for the Third Circuit in *United States ex rel. Scoleri v. Banmiller, supra,* held a similar Pennsylvania procedure, when applied in capital cases, unconstitutional. See *Spencer, supra,* at p. 559, n.5. This comment is puzzling, since the Third Circuit in three cases decided after *Scoleri* but before *Spencer* had held that *Scoleri* had not found the Parker rule procedure unconstitutional *per se* but had mandated a case-by-case analysis of Parker rule appeals to determine whether the record revealed prejudice amounting to a denial of due process. See *United States ex rel. Rucker v. Myers,* 311 F.

form a jury of a defendant's prior derelictions through allegations in the indictment and the introduction at trial of proof of the defendant's past convictions. This evidence was submitted to the jury under instructions that it was not to be considered probative on the issue of guilt, but rather was to be considered only in the event a verdict of guilty was reached and only on the question of the penalty to be imposed on defendant. The procedure before the Court in *Spencer* was thus similar to, but broader than, the Parker rule procedure now before us.[2]

In upholding the Texas procedure, the Court stated that the conceded possibility of prejudice was more than offset by a valid state purpose. "[I]n the face of the legitimate state purpose and the longstanding and wide-spread use that attend the procedure under attack here, we find it impossible to say that because of the possibility of some collateral prejudice the Texas procedure is rendered unconstitutional under the Due Process Clause . . . With recidivism the major problem that it is, substantial changes in trial procedure in countless local courts around the country would be required were this Court to sustain the contentions made by these petitioners . . . To take such a step would be quite beyond the pale of this Court's proper

2d 311 (3d Cir. 1962), *cert. denied,* 374 U.S. 844 (1963) ; *United States ex rel. Lowry v. Myers,* 364 F. 2d 297 (3d Cir. 1966) ; and *United States ex rel. Johnson v. Rundle,* 243 F. Supp. 695 (E.D. Pa. 1964), *aff'd. per curiam,* 349 F. 2d 416 (3d Cir. 1965), *rev'd.,* 386 U.S. 14 (1967).

[2] The Parker rule procedure applied only to trials involving charges of first degree murder where the jury was given discretion to impose a death sentence or life imprisonment. The Texas procedure challenged in *Spencer* applied in trials of defendants charged with a felony "less than capital" and trials of all persons who were charged with a capital offense after previously having been convicted of an offense of the same category.

function in our federal system." *Spencer, supra,* at pp. 564, 568. *Spencer* on its face thus appears to hold that the challenged procedure, and by inference the Parker rule procedure before us, is not *per se* unconstitutional, and that holding reflects in part the Court's reluctance to intrude in this case upon the field of state procedure and prescribe a single constitutionally permissible solution to evidentiary problems.

The scope of this holding, however, is cast into question by *Rundle v. Johnson,* 386 U.S. 14 (1967), a *per curiam* decision of the Court handed down only a month after *Spencer* was decided. The *Johnson* case reversed and remanded to the Court of Appeals "for consideration of the unresolved issues" a judgment of that Court which affirmed per curiam the District Court's grant of a habeas corpus petition brought by Johnson, a Pennsylvania prisoner serving a sentence of life imprisonment under a conviction of murder. *United States ex rel. Johnson v. Rundle,* 243 F. Supp. 695 (E.D. Pa. 1964), *aff'd. per curiam,* 349 F. 2d 416 (3d Cir. 1965).[3] In his petition, Johnson claimed that under the facts of his case the admission of evidence of his prior record during his trial and pursuant to the Parker rule procedure constituted a denial of due

---

[3] Mr. Justice DOUGLAS dissented in *Rundle v. Johnson, supra,* noting that "The District Court granted the petition for habeas corpus since the introduction of the accused's 'prior criminal record for obstructing a railroad was so fundamentally unfair as to deny him due process of law.'" *Ibid.*

Pursuant to the remand, the Court of Appeals noted that the District Court opinion adverted to the existence of other serious questions of constitutional import which it did not decide in view of its reversal on the issue of the evidence of prior convictions. Accordingly, that Court remanded the case to the District Court for consideration of those issues. *United States ex rel. Johnson v. Rundle,* 387 F. 2d 137 (3d Cir. 1967). We find no record of further proceedings in the case.

process.[4] In *Johnson,* the defendant was tried for murder in connection with the death of two individuals who were killed in the derailment of a train. Defendant had previously been convicted of the crime of obstructing a railroad, and evidence of this conviction was submitted to the jury at his trial. At trial the Commonwealth offered no direct evidence of defendant's guilt; only a confession and certain statements by the defendant (both allegedly the result of coercion) connected the defendant with the crime. Moreover, the prior conviction evidence was admitted over objection, even though the prosecuting District Attorney did not press for the death penalty at any point in the proceedings and even though the foreman of the jury had stated during the voir dire examination that he would not return a penalty of death. Viewing the case in the light of these facts, Judge HIGGINBOTHAM granted the habeas corpus petition "since the introduction of Johnson's prior criminal record for obstructing a railroad was so fundamentally unfair as to deny him due process of law." *Johnson, supra,* at p. 700. Given the facts of the *Johnson* case, it is arguable that the Supreme Court's decision in *Rundle v. Johnson, supra,* was meant to enunciate a *per se* rule that a state's use of procedures like those involved in *Spencer* could not as a matter of federal constitutional law amount to a denial of due process. However, in the absence of a specific holding to that effect, and in the face of the Court's emphasis in *Spencer* on the state courts' responsibility for such procedural issues, we do not so read *Spencer* and *Johnson.* We do not find that those

---

[4] In his decision in the District Court at p. 697 Judge HIGGINBOTHAM specifically read the *Scoleri* and *Rucker* cases, *supra,* at nt. 2, as "adopting a factual case-by-case approach to determine whether the introduction of a defendant's prior record under the Parker rule may be prejudicial."

cases preclude a holding by this Court that the effect of the Parker rule procedure in a given case was such that the defendant suffered prejudice amounting to a denial of due process, notwithstanding the general constitutional validity of the Parker rule procedure.

The issue before us is therefore one of defining that degree of possible prejudice which is consistent with the requirements of due process, and evaluating the case in hand to determine whether such prejudice is here present.

The U. S. Court of Appeals in *United States ex rel. Rucker v. Myers,* 311 F. 2d 311, at 315 (3d Cir. 1962), *cert. denied,* 374 U.S. 844 (1963), enunciated the rule that the Commonwealth's reliance on the Parker rule procedure was tantamount to a denial of due process "only in the clearest cases of gross and easily avoided prejudice." In *Commonwealth ex rel. Gist v. Rundle,* 419 Pa. 458, 460, 214 A. 2d 496 (1965), this Court reformulated this test, finding that a new trial was mandated wherever the admission into evidence of a defendant's prior criminal record under the Parker rule procedure created "a realistic probability of prejudice", while in *Commonwealth ex rel. Cannon v. Maroney,* 419 Pa. 461, 214 A. 2d 498 (1965), it was implied that the test was whether a "realistic probability of serious prejudice" resulted from the introduction of such evidence. Consequently, we must determine, with the guidance of past court decisions, whether appellant Chapasco suffered at the least "a realistic probability of prejudice" by the introduction at trial of his past criminal record.

Appellant contends that the decision of the Court of Appeals in *United States ex rel. Lowry v. Myers,* 364 F. 2d 297 (3d Cir. 1966), demonstrates that the degree of possible prejudice in his case was constitutionally impermissible. There the court ruled, after considering "all relevant elements," that the introduc-

tion of the relator's prior criminal record impaired "his right to a fair determination by the jury of the question of his guilt." *Lowry, supra,* at p. 300. Appellant relies on *Lowry,* because Lowry's murder conviction concerned the armed robbery and the shooting of David Sklar that resulted in his own conviction.

This common ground does not, however, dictate a finding of prejudice, for as Judge BIESTER pointed out in his opinion below, the evidence presented against the two men was quite dissimilar. Ostroff, who was a witness for the Commonwealth at trial, identified Chapasco as one of the robbers present at the scene of the murder, but no witness identified Lowry. Chapasco initially gave an incriminatory statement to the authorities, but Lowry made an exculpatory one. In addition, the police found at the scene of the crime a pistol which held a cartridge clip with Chapasco's thumbprint on it, and they discovered the murder weapon in Chapasco's bedroom at his sister's house. Finally, Lowry's prior criminal record, as presented at trial, included only instances of arrest without conviction while Chapasco had pleaded guilty to each prior unrelated offense revealed on his record. These distinctions between the evidence presented in *Lowry* and in the case now before us indicate that *Lowry* does not automatically lead to a conclusion in favor of appellant.

Six reported decisions have treated the relationship between the Parker rule procedure and constitutional due process in some detail. In *Scoleri, supra, Lowry, supra,* and *Johnson, supra,* federal courts accepted defendants' contentions that they were indeed denied due process by introduction of evidence of their prior unrelated offenses.[5] In *Rucker, supra, Commonwealth*

---

[5] As noted above, *Johnson, supra,* was reversed by the United States Supreme Court. Consequently, while we are not entirely

*ex rel. Marino v. Myers,* 419 Pa. 448, 214 A. 2d 491 (1965), and *United States ex rel. Gist v. Rundle,* 371 F. 2d 407 (3d Cir. 1967), on the contrary, the courts, both Pennsylvania and federal, concluded that the several criminal defendants were not prejudiced by the introduction of their records at trial. The decisions of these half dozen cases have considered significant three separate, although not totally unrelated, factors in weighing the possible prejudice engendered by adherence to the Parker rule procedure. No one factor is decisive; no single element is the touchstone of decision. The likelihood of prejudice must be measured in the light of these factors taken together.

The first factor is the number and nature of the offenses disclosed in defendant's prior criminal record, and particularly the relationship between those crimes and the circumstances of the murder with which he is charged. The attention paid to this facet reflects judicial concern that either a marked similarity between the defendant's past crimes and the circumstances surrounding the crime presently charged or a record replete with prior misdeeds will influence the jury on the issue of defendant's guilt despite any contrary admonition of the trial court.

Thus, in *Scoleri,* the Commonwealth presented evidence of twenty-five prior charges of armed robbery against a defendant accused of committing a murder in the course of an armed robbery. The Court labeled this evidence "gravely prejudicial" and granted Scoleri's petition for habeas corpus. In *Lowry,* the relator's prior criminal record concerned mostly larceny of motor vehicles, as distinguished from armed robbery, but the court lumped these crimes together as efforts

---

sure wherein the Court found the proceedings in that case defective, we shall not hereafter advert to the reasoning of the District Court in the *Johnson* decision.

by the accused to obtain property without working for it legitimately. Judge FREEDMAN, in deciding "whether in all the circumstances of the particular case it can be said that defendant may have been seriously prejudiced by introduction of his prior criminal record", pointed out that the "nature as well as number of prior convictions" represents an element to be considered in estimating the prejudice involved.

On the other hand, the court in *Marino, supra,* at p. 455, considered the relator's prior crimes, although also against the person, as "not strikingly common or significantly similar" to the situation involving the murder of his teenaged daughter's alleged seducer and refused to grant Marino's habeas corpus petition. Relator's criminal record in *Gist, supra,* involved conviction only for carrying a concealed deadly weapon, a minor crime which the court regarded as having no prejudicial relationship to the murder charge at trial. *Rucker, supra,* however, fails to fit this pattern. Even though relator's prior criminal record of voluntary manslaughter and aggravated assault seemingly bore substantial similarity to his murder charge, the court rejected the argument that the introduction of Rucker's past offenses may have unfairly influenced the jury. The result in *Rucker, supra,* confirms the need to look not only to this one element but rather to the "critical intersection and cumulative effect," of all the factors involved in a particular case. *Marino, supra,* at p. 455.

The second factor considered by the courts is whether the Commonwealth actively sought the death penalty for the defendant. If the prosecution does not insist upon the electric chair, no apparent reason exists for the introduction of defendant's prior criminal record, since that evidence is only relevant for its bearing on the jurors' choice of life imprisonment or death as

156

the first degree murder sentence.[6]   Indeed, the state's
endeavor to introduce such evidence during trial seems
prejudicial in and of itself, absent a prosecutorial in-
tention to press for the death penalty.   Hence, in *Low-
ry, supra*, the court paid particular attention to the
Commonwealth's lack of interest in the death penalty.
*Scoleri, supra*, represents the only decided case known
to us in which the prosecution at trial asked the jury
for the electric chair, and the introduction of defend-
ant's prior criminal record was later found to be a
violation of the Fourteenth Amendment.   The Com-
monwealth in *Rucker, Gist*, and *Marino* actively sought
the death penalty.

The third, and perhaps most crucial, factor consid-
ered in the cases is the existence of what Judge FREED-
MAN referred to in *Lowry, supra*, as a "substantial is-
sue of guilt."   The opinions in *Scoleri, supra*, and
*Lowry, supra*, all reflect the existence of a conflict in
the evidence sufficient to raise the possibility of ac-
quittal absent the tainted admission of defendant's rec-
ord of prior unrelated offenses.   Thus, Judge SMITH
found that *United States ex rel. Gist v. Rundle, supra*,
at p. 409, was not "a case in which the scales of jus-
tice were delicately balanced between guilt and inno-
cence," holding that there was "ample evidence" to
justify the relator's murder conviction.   Similarly, the
court in *Rucker, supra*, where the only real issue was
the validity of a defense of intoxication, viewed the
evidence against the relator as "clear, overwhelming
and uncontroverted."   *Marino, supra*, involved only the
issue of the degree of the murder, and this Court found

---

[6] It is true, of course, that it is within the province of the
jury to assess the death penalty against a defendant convicted of
first degree murder notwithstanding the position of the Common-
wealth in the matter.   Act of June 24, 1939, P. L. 872, §701, as
amended, 18 P.S. §4701.   See *Lowry, supra*, at p. 299.

that the "overwhelming weight" of "direct and abundant" evidence was against the defendant.

Viewing appellant's case in light of these three factors, we are unable to find that any prejudice he may have suffered amounted to a denial of due process. First, defendant's prior criminal record consisted of guilty pleas entered at one time in 1935 to charges of arson, entering a building with intent to commit a felony, larceny, carrying concealed deadly weapons, and assault and battery with intent to kill. An assessment of appellant's case, based only on the relationship between this record and the pending murder charge is inconclusive, since it places Chapasco in the same class with *Lowry, supra,* where Judge FREEDMAN for the Court of Appeals found a denial of due process, and *Rucker, supra,* and *Marino, supra,* where the same federal court and the Pennsylvania Supreme Court, respectively, upheld defendants' convictions. Appellant's record consisted of this one instance of prior pleas which were entered some fifteen years before the trial in question. While the prior record and the present action both involved crimes against the person, robbery, and the use or possession of a deadly weapon, we do not find that this similarity was of itself so prejudicial as to amount to a denial of due process.

Second, since the prosecution actively demanded the death penalty for appellant, the admission into evidence of appellant's prior convictions served its lawful purpose under the Parker rule procedure.

The final, and perhaps the most significant, factor—the existence of a substantial issue of guilt—places Chapasco somewhat closer to *Gist, supra,* than to any other case. As indicated above, the evidence against Chapasco was quite strong. He at one point admitted participation in the holdup resulting in the death of David Sklar. Ostroff, the victim's brother-in-law, identified Chapasco as one of the robbers. The

statement of Martin Pearson, also convicted for his role in the crime, implicated Chapasco. The police found Chapasco's thumbprint on the cartridge clip of the pistol discovered near the scene of the episode; Chapasco himself revealed the whereabouts of the actual murder weapon to the authorities. The cumulative weight of this evidence is heavy and in our view more than offsets any likelihood that the disputed introduction of appellant's prior criminal record prejudiced the jury's determination on the issue of guilt.

Viewing the case as a whole, the introduction of Chapasco's criminal record in this case stands nearer to *Rucker, Marino,* and *Gist* than to those instances in which the courts have found a violation of the due process standards.

This Court's concluding observations in *Marino, supra,* are equally pertinent here: "In reaching our conclusion we are not unmindful of the potential hazards presented by the pre-Split-Verdict Act practice. The enactment of that Act was a legislative response to this potential and a desirable corrective. This Court is sensitive to the need for scrupulous care in the consideration of those cases which come before us under the shadow of our former practice. But we are also mindful of our responsibility to insure that those who have justly earned the condemnation of their peers are not the undeserved beneficiaries of a mistaken and misdirected largesse. Our system of jurisprudence has traditionally been concerned with the accommodation of the rights of the criminally accused and the rights of society. In accordance with that tradition, we seek by our review to insure that those who by reason of realistic probability of prejudice have been denied their constitutional right to a fair trial are afforded that right." *Marino, supra,* at p. 457. Appellant Chapasco has not presented this Court with such a case.

Order affirmed.