## Commonwealth v. Higley

*James G. Morgan, Assistant District Attorney,* for Commonwealth.
*Arthur Dils,* for defendant.

DOWLING, *J.*, June 18, 1975—Through the lens placed over our eyes by the Commonwealth's verdict, we observe defendant, angered by being set up for an arrest, making arrangements to have informant, one Jean Check, effectively removed from the board. Mate was to be delivered by two men who, unknown to Mr. Higley, were undercover narcotic agents. When they told all, the jury listened and convicted Ronald Higley of "solicitation to commit murder."

The offense is defined by the Crimes Code as follows:

"A person is guilty of solicitation to commit a crime if with the intent of promoting or facilitating its commission he commands, encourages or requests another person to engage in specific conduct which would constitute such crime or an attempt to commit such crime or which would establish his complicity in its commission or attempted commission." Act of December 6, 1972, P.L. 1482 (No. 334), 18 Pa. C.S. §902(a).

In more detail, the evidence produced by the prosecution disclosed that during the fall of 1973, two undercover members of the Pennsylvania State Police, Troopers Kay and Evanko, came in contact with defendant in the course of their various investigations. On one occasion when they met him, October 8, 1973, he told them that he had just been released from the Dauphin County Prison on bail, having been arrested on a drug charge as a result of being informed upon by one Jean Check, who he learned was working as an informant with the State Police. The troopers testified that defendant said to them "I want the bitch killed, I want her dead." Defendant then asked if the two troopers would kill her and if they would, for how much. After some discussion, the troopers set a price of $500. Defendant agreed to provide the gun for the killing and also a picture of his intended victim for positive identification. He then drove the two troopers past defendant's residence. Later, in a local bar, when they further discussed the details of the killing, he wrote her first name and address on the back of a match cover which he gave to the troopers. The parties next met on October 11, 1973, at which time defendant said he was still interested

in "getting the girl hit" but that he hadn't been able to get a gun and that the money was not readily available. The final meeting occurred on November 12, 1973, when the troopers went to defendant's home and told him they were leaving town. Mr. Higley said he definitely wanted the job done but he felt that the girl was being watched by the police and that it was too hot at this time to kill her. He said he preferred to wait until after Christmas when things would settle down. He was arrested several days later.

In his post-trial motions, defendant raised three issues: the introduction of evidence pertaining to prior crimes, the defense of renunciation, and the contention that the charge should be dismissed because the crime could not possibly have been carried out since the solicitation was made to State Police. However, in his brief and in oral argument, he has not pursued the last point of impossibility of performance but has substituted an issue of the sufficiency of the evidence.

The above factual recital demonstrates that the jury's right to convict defendant was irrefragable. He requested that the girl who had helped to put him in prison be killed, described his victim, pointed out where she lived, and gave the supposed killers her name and address. Furthermore, he promised to provide a gun which could not be traced, and her picture. The fact that he never actually supplied the gun, the picture, nor the money, goes to the weight of the evidence and not its sufficiency. It is black letter law that the test in determining sufficiency is whether, accepting as true all the evidence of the Commonwealth and all reasonable inferences arising therefrom, could the jury

properly have concluded beyond a reasonable doubt that defendant was guilty. Clearly, it could have.

During Mr. Higley's trial on the charge of solicitation to commit murder, evidence was introduced that defendant had been arrested on drug charges. The complained of testimony appears on page 13 of the record:

"Q. All right. Did you subsequently meet the defendant in your capacity as a state policeman, as an undercoverman?

"A. I did, sir, on numerous occasions after that.

"Q. Did you have occasion to meet with the defendant on October 8 of 1973?

"A. I did, sir. Mr. Higley met Trooper Evanko and I at the Dunkin' Doughnuts place out on Paxton which was a routine place for us to meet him whenever we were supposedly in town.

"THE COURT: Who was with you at the time?

"THE WITNESS: Trooper Evanko.

"BY MR. MORGAN:

"Q. And was there any conversation at the Dunkin' Doughnuts on that night?

"A. Inside the place there was little conversation. Mr. Higley stated that he had a serious matter he wanted to discuss with us so we left the place and got into Mr. Higley's vehicle with Trooper Evanko getting in the front seat and myself getting in the rear." (N.T. 12.)

"Q. What was the basis of this conversation?

"A. Well, prior to this time, Mr. Higley had just gotten out on bail, out of Dauphin County Prison, and he stated to Trooper Evanko and I that he wanted the bitch hit that had set him up. At this time, I said to him, 'What do you mean, hit, Ron?', and he said, 'I want her killed, I want her dead.' We

stated—asked him why and this, we found out at the time the other troopers of the Departmental Headquarters undercover detail had made purchases from Mr. Higley through a subject." (N.T. 13.)

Defendant makes the point that this evidence tainted him as a drug purchaser and dealer, thus prejudicing him in the eyes of the jury and precluding him from obtaining a fair trial. He also asserts that the prior narcotics arrests were independent of the charge for which he was on trial with no logical or legal reason permitting their introduction.

It is almost too axiomatic to repeat the common-law rule that, in a criminal prosecution, proof which shows or tends to show that the accused is guilty of the commission of other crimes and offenses at other times is incompetent and inadmissible for the purpose of showing the commission of the particular crime charged: Commonwealth v. Trowery, 211 Pa. Superior Ct. 171 (1967). The purpose of this rule is, of course, to prevent the conviction of an accused for one crime by the use of evidence that he has committed other unrelated crimes and to preclude the inference that because he has committed other crimes he was more likely to commit the crime for which he is on trial. It is logical and reasonable to presume that the effect of such evidence would be to predispose the minds of the jurors to believe the accused guilty and thus strip him of the presumption of innocence. However, there are exceptions to this general rule.

It is well established that evidence of other crimes is admissible when that evidence tends to prove (1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme, plan or design, embraced in two or more crimes so related to each

other that proof of one tends to prove the other; or (5) to establish the identity of defendant charged with the commission of the crime on trial. When the evidence is relevant and important to one of these five issues, the prejudicial effect is outweighed by the probative value: Commonwealth v. Peterson, 453 Pa. 187 (1973).

Here, the evidence that Jean Check was involved with the Pennsylvania State Police and caused defendant's arrest and incarceration provides the motive for defendant's solicitation to murder her. It also tends to prove that he had the requisite intent and criminal state of mind to promote or facilitate the commission of that crime.

A similar situation was faced by the Pennsylvania Supreme Court in the case of Commonwealth v. Geiger, 455 Pa. 420 (1974), where defendant was convicted of first degree murder. At page 423, the court said:

"Appellant next objects to the trial court's failure to grant appellant's motion for the withdrawal of a juror, when two Commonwealth witnesses testified that appellant had told the victim and the victim's family that he wanted them to 'suffer like I suffered when I was in jail.' According to appellant, this testimony constituted inadmissible references to his previous criminal record, citing Commonwealth v. Chapasco, 436 Pa. 143, 248 A. 2d 638 (1969). We do not agree. The statements made by appellant to the victim and the victim's family were intimately related to the crime charges, showing the state of appellant's mind at the time the crimes were committed. As such, they were properly admissible."

The cases cited by defendant involve the application of the general rule and not the exceptions.

Thus, in Commonwealth v. Bonnano, 216 Pa. Superior Ct. 201 (1970), a police officer testified he arrested defendant while he was in Federal prison. Commonwealth v. Trowery, supra, and Commonwealth v. Blose, 160 Pa. Superior Ct. 165 (1947) concerned the mention of police and penitentiary photographs of defendant which were not essential to establish his identity. In Commonwealth v. Savor, 180 Pa. Superior Ct. 469 (1956), the codefendant who had pleaded guilty was questioned as to how long he had known defendant. He replied that he had first met him in Western Penitentiary. The trial court instructed the jury to disregard the remark and the Superior Court held that the cautionary instruction had cured any prejudice and refused a new trial. And in this case, the jury was charged concerning the purpose of testimony relating to prior offenses and repeatedly told that they could not condemn and convict a defendant on the basis of his prior criminal record. Furthermore, the defense voiced no objection to, nor requested any further instruction from the court's charge on this subject.

Finally, Mr. Higley raises the defense of renunciation. The Crimes Code does provide in subsection (b) to section 902 Criminal Solicitation that:

"It is the defense that the actor, after soliciting another person to commit a crime, persuaded him not to do so or otherwise prevented the commission of the crime, under circumstances manifesting a complete and voluntary renunciation of his criminal intent."

Defendant contends that because he never furnished the gun, the money, nor the photograph as

he had promised, he prevented the commission of the murder and thus effectively renounced his criminal intent. But, basically, this was a factual determination which the jury decided against defendant, as it was certainly warranted in doing on the Commonwealth's evidence which showed that as late as November 12, 1973, just prior to his arrest, defendant still wanted the girl killed but wanted to postpone the execution of his plans because things were "too hot" at that time. This evidence hardly conforms to the statutory requirement of a complete and voluntary renunciation, being motivated, at least in part, by defendant's fear of detection or difficulty in carrying out the crime at the particular time.

Due to the recent enactment of the Crimes Code, there appears to be no Pennsylvania decision speaking to the matter. However, this portion of the Crimes Code was taken verbatim from section 5.02 of the model penal code which had previously been adopted in both Illinois and New York. In People v. Nassar, 301 N.Y. Supp. 2d 671, 677 (1969), it was stated:

"Basically, renunciation is a trial jury question and not one of law. It involved close questions of fact, turning on credibility of witnesses, and such weighing of credibility is traditionally considered to be within the jury's peculiar competence. Further, it involves determination of a person's motivation and intent which require the collective objectivity of a jury, resulting in the composite judgment of a reasonable man as to what those motives were. These are beyond a judgment as a matter of law and remain positive facts for a jury."

In a later New York case, People v. Bauer, 350 N.Y. Supp. 2d 745 (1974), it was very pertinently stated:

"The indictment was dismissed upon the ground that the evidence before the Grand Jury clearly established the defense of renunciation as defined in subdivision 3 of section 40.10 (formerly §35.45) of the Penal Law. Under that statute, such renunciation must be 'voluntary and complete,' that is, it must not have been motivated in whole or in part by 'a belief that circumstances exist which increase the probabilty of detection or apprehension of the defendant or another participant in the criminal enterprise, or which render more difficult the accomplishment of the criminal purpose' (Penal Law, §40.10, subd. 5). While the evidence before the Grand Jury did establish that defendant had abandoned his criminal enterprise, the circumstances were such as to raise a tangible question as to whether he was motivated by the suspicion that the authorities had been alerted and that he was in imminent danger of apprehension if he pursued the matter. 'There is no effective renunciation where it is prompted by a fear of detection of arrest' (Rothblatt, Criminal Law of New York, §42, citing Penal Law, former §35.45, subd. 5)."

Accordingly, we enter the following

.

ORDER

And now, June 18, 1975, defendant's motion for a new trial and motion in arrest of judgment are denied and the District Attorney is directed to present him for sentencing.